Petition for review granted; cross-petition for enforcement denied by published opinion. Judge DUNCAN wrote the majority opinion, in which Judge SMITH concurred. Judge KING wrote a dissenting opinion.
DUNCAN, Circuit Judge:
The Tampa Tribune (“the Tribune”) appeals from a judgment of the National Labor Relations Board (“the Board”) that it violated the National Labor Relations Act (“the Act”) when it fired employee Gregg McMillen for making derogatory remarks about the Tribune’s Company Vice President. The administrative law judge (“ALJ”) found that McMillen’s dismissal was lawful because his statement was so profane and offensive that it was not protected by the Act. On review, the Board reversed the ALJ’s decision. The Tribune petitioned this court for review; and the NLRB brought a cross-petition for enforcement of the Board’s decision. We find that the Board erred as a matter of law concluding that the law protects McMillen’s use of profanity regarding his employer, which was directed to his supervisors, during work hours and in the work place, in a conversation McMillen initiated *183 regarding an undisputedly accurate and legal letter he had admittedly never read, and the setting of which was physically and temporally removed from the site of the ongoing collective bargaining negotiations. We therefore reverse its decision and reinstate the decision of the ALJ.
I.
A.
The National Labor Relations Act, 29 U.S.C. §§ 151-69, ensures that employees are not discriminated against for engaging in collective action in the workplace. Its provisions protect the rights of employees to organize and engage in collective bargaining and associated activities. 29 U.S.C. § 157. Its protections prevent employers from retaliating against their workers for undertaking “concerted activities” and provide a process for enforcement of the rights guaranteed by the Act. 29 U.S.C. §§ 157,160.
After Gregg McMillen was fired from his job as a journeyman pressman at the Tribune, he individually filed charges with the General Counsel of the Board, claiming that his dismissal contravened the Act’s protections. The charging statement issued by the General Counsel alleged two violations of the Act: (1) a violation of section 8(a)(1) for not allowing McMillen to be accompanied by a union representative at his disciplinary meeting, 29 U.S.C. § 158(a)(1); and (2) a violation of sections 8(a)(1) and 8(a)(3) for terminating McMil-len as a result of protected concerted activities, 29 U.S.C. § 158(a)(1), (8).
The facts of this case as found by ALJ are not disputed, and contrary to the dissent’s characterization, we take them as true. Gregg McMillen was a pressman for The Tampa Tribune, a daily newspaper published by Media General Operations, Inc. d/b/a The Tampa Tribune (“the Tribune”).[1] On October 31, 2004, the contract between the Tribune and the Graphic Communications Conference of the International Brotherhood of Teamsters, Local 180 (“the Union”) expired. McMillen belonged to the Union, which represented the pressroom employeés of the Tribune, and was covered by the expired contract.
Following the expiration of the previous agreement, the Tribune and the Union began the process of renegotiating their contract. The negotiations were rancorous and were ongoing at the time of the events that led to McMillen’s dismissal in November 2005.
During these negotiations, Bill Barker, Company Vice President of the Tribune, sent a series of letters to the pressroom workers describing what was occurring from his perspective. Significantly for purposes of our decision, there is no dispute in this case that the letters were legal and accurate. However, many of the pressmen took exception to them, and McMillen was among roughly 25 signatories to a letter sent to Barker on November 4, 2005 that protested Barker’s letter-writing and characterization of the negotiations. On November 9, Barker wrote to the employees in response to their letter of November 4, again expressing his view that the Union was the major source of delay in the process.
On the night of November 10, 2005, McMillen arrived for his third-shift job at the press. During that shift, he went into the office that is located in the pressroom. Two supervisors — Glenn Lerro, the press-room foreman, and Joel Bridges, the assistant foreman — were the only other people in the office. While there, McMillen stated in response to a question about how he *184 was doing that he was “stressed out” as a result of the latest letter from Barker. Lerro asked if McMillen had seen the latest letter, and McMillen replied that he had not. Lerro informed him that it was likely a response to the employees’ letter of November 4. McMillen then said: “I hope that fucking idiot [Barker] doesn’t send me another letter. I’m pretty stressed, and if there is another letter you might not see me. I might be out on stress.” J.A. at 372.
Lerro and Bridges made no response to the statement at the time, but the following morning Lerro did send an email to George Kerr, the pressroom manager, informing him of McMillen’s statement. Barker and George Stewart, the production director, were copied on the email. Lerro also asked Bridges to send Kerr an email relating his version of the events, which Bridges did.
McMillen failed to show up for his next shift, which was scheduled on November 11. He claimed this absence was due to the sleeping pill he was forced to take to calm down after reading Barker’s letter following his arrival home on November 10. As a result of the missed shift, McMil-len was informed that he would be suspended from two shifts without pay. When he returned to work on November 13, he signed the resulting disciplinary report and added an editorial comment to the effect that it was Barker’s “being [sic] discrimination, harassing and threatening letters” which caused him to miss his shift. J.A. at 373. At that time, he also told Lerro he was sorry if any of his remarks on November 10 were inappropriate, reiterating that that Barker “gets to [him].” Id.
Meanwhile, Kerr, George, and Barker met to discuss the report of the incident that they had received from Lerro. As a result of McMillen’s statement, the Tribune’s management decided to fire him for a violation of Pressroom Office Rule 9.[2] When he arrived at the Tribune on November 16, McMillen was escorted into Stewart’s office to meet with Stewart, Kerr, and Rick Serra, the Tribune’s Human Resources Manager. Donald Hale, another Tribune pressman, attempted to accompany McMillen into the office but was told that the meeting was not for the purpose of an investigation and so McMil-len had no right to union representation. Kerr stated that he had been informed that McMillen had referred to Barker in derogatory terms; McMillen interrupted the comment to acknowledge having made the statement.[3] Kerr then informed McMillen that he was fired, and McMillen was subsequently escorted from the building.
B.
The case was first heard by ALJ Joel Biblowitz. Following a full hearing and fact-finding, the ALJ dismissed both *185 charges against the Tribune. The ALJ concluded that McMillen had no entitlement to representation and therefore that there was no violation of his right to representation. In analyzing whether McMil-len’s dismissal was wrongful, the ALJ concluded that McMillen was engaged in concerted activity at the time of his statement but that his statement was so “profane, offensive and personally denigrating” as to be unprotected by the Act. J.A. at 383.
The General Counsel entered exceptions to the ALJ’s decision. On appeal, the Board upheld the ALJ’s decision as to the first charge but reversed the ruling on the second, finding that McMillen’s dismissal violated the Act. J.A. at 397. The Tribune filed a petition for review with the Fourth Circuit and the Board brought a cross-appeal for enforcement of the Board’s decision.
II.
The Tribune appeals the decision of the Board through Media General Inc., the parent company of The Tampa Tribune. Media General is incorporated in the Commonwealth of Virginia and transacts business in this circuit. We therefore have jurisdiction over the petition for review and cross-petition for enforcement pursuant to §§ 29 U.S.C. 160(e) and (f).
On appeal, the Tribune contends that the Board impermissibly overturned credibility determinations of the ALJ; that McMillen was not engaged in a concerted activity protected by the Act when he made the derogatory statement about Barker; and that even if the activity in question were protected, the Board misapplied its precedent in finding that McMil-len’s statement was not so egregious as to lose the Act’s protection. We address each of these arguments in turn below.
Legal determinations by the Board must be upheld by a reviewing court if they are “rational and consistent with the Act.” Media General Operations, Inc. v. NLRB, 394 F.3d 207, 211 (4th Cir.2007). However, the reviewing court has a responsibility to correct any errors of law that are made by the Board in reaching its conclusions. Id. Mixed questions of law and fact are reviewed under a substantial evidence standard “where the Board’s legal interpretations are otherwise valid.” NLRB v. Air Contact Transp. Inc., 403 F.3d 206, 210 (4th Cir.2005).
A.
The Tribune argues that the Board impermissibly overturned credibility findings of the ALJ in reaching its decision. Specifically, the Tribune contends that the ALJ’s finding that McMillen’s derogatory statement about Barker was the reason for his firing is a credibility determination that should be insulated from the Board on review. Appellant’s Br. at 41-42 (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), for the proposition that the Board owes considerable deference to the ALJ on findings of fact because the latter has “heard the evidence and seen the witnesses”). The Tribune’s argument on this point is misguided.
The determination of the nature of the outburst is not properly a “credibility determination” made by the ALJ but a legal conclusion based upon the Board’s inferences from facts in the record. The ALJ made clear in his opinion the points at which he was making credibility determinations. See, e.g., J.A. at 379. But his analysis of the application of the law to the fact he found does not qualify as a credibility determination. Therefore, the ALJ’s determination is not entitled to any special deference by the Board. The Board was *186 not constrained by the ALJ’s findings in determining whether McMillen’s conduct had and retained the protection of the Act and was free to find, subject to review by this court, that it did.
B.
The Tribune also contends that McMil-len was not engaged in protected concerted activity when he made his derogatory statement about Barker. The ALJ found and the Board affirmed that McMillen’s conduct was concerted activity within the meaning of the Act because “it was part of an ongoing collective dialogue between Barker and the unit employees about the substance and process of the contract negotiations.” J.A. at 395. Specifically pointing to the letters that were exchanged between Barker and the pressroom employees, the Board found that McMillen’s derogatory statement was “a logical outgrowth of the prior collective and concerted activity.” Id. (internal quotation marks omitted) (citing Every Woman’s Place v. Doran, 282 N.L.R.B. 413 (1986)).
While we do not find that this conclusion is wrong as a matter of law, we do note that the conduct in question skirts the outer bounds of that which can be considered concerted activity under the Act’s auspices. McMillen’s derogatory comment was part of a conversation he individually initiated; it was not temporally associated with the actual negotiations in question or the actions that prompted it; and it could not have been directly responsive to the Tribune’s negotiating positions, since McMillen prefaced the remark by stating that he had not yet read Barker’s letter. Cf. Stanford N.Y., LLC, 344 N.L.R.B. 558, 559 (2005) (spontaneous outburst in direct response to discussion about union activities); Trus Joist MacMillan, 341 N.L.R.B. 369, 369-70 (2004) (employee requested meeting specifically to discuss an illegal firing). Nevertheless, we decline in this case to overturn the finding that McMil-len’s conversation concerning Barker and Barker’s letters was entitled to the Act’s protection in the first instance. This does not, however, settle the inquiry about whether McMillen retained the Act’s protection when he launched an ad hominem attack against his supervisor.
C.
 Even concerted actions that are assumed to be protected by the Act may forfeit such protection if they are “egregious or flagrant.” Care Initiatives, Inc., 321 N.L.R.B. 144, 151 (1996) (quoting Coors Container Co. v. NLRB, 628 F.2d 1283, 1288 (10th Cir.1980)). The Tribune contends, and the ALJ found, that even if McMillen’s statement was made in the context of concerted activity, he forfeited the protection of the Act because he engaged in “vulgar, profane, and obscene language directed at ... [an] employer,” Care Initiatives, 321 N.L.R.B. at 151, in responding to his employer’s legal acts. We agree.
The test for whether an employee has forfeited the protection of the Act as a result of the nature of his conduct was set forth by the Board in its decision in Atlantic Steel Co. v. Chastain, 245 N.L.R.B. 814 (1979). There, the Board held that a reviewing body must balance four factors to determine whether the Act’s protection applies: “(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee’s outburst; and (4) whether the outburst was, in any way, provoked by an employer’s unfair labor practice.” Id. at 816. If the balance is such that the conduct crosses the line from “protected activity ... [to] opprobrious conduct,” the worker loses the protection of the Act. Id.
*187 In the instant case, the ALJ found and the Board agreed that the first two factors weighed in favor of McMillen retaining the Act’s protections. J.A. at 396. The discussion during which the derogatory remark was made took place away from the pressroom floor in an office that was used by pressroom supervisors and thus was at least semi-private.[4] In addition, McMil-len’s comment occurred in the context of a discussion of Barker’s letters, and those letters dealt with the ongoing contract negotiations between the Tribune and the Union. The Board also agreed with the ALJ that the fourth factor militated against extending the protection of the Act, since McMillen never claimed that he was responding to an unfair labor practice. Instead, his outburst was in response to a series of admittedly legal and truthful letters written by Barker. J.A. at 383, 396.
Where the two adjudicators parted ways was on the significance of the third factor. The ALJ determined that the nature of the outburst was “so egregious” that it removed McMillen’s statement from the Act’s protection. J.A. at 381. The Board disagreed. Analyzing the record, it found that the nature of the remark was only moderately prejudicial to McMillen’s retention of the Act’s protection. The Board based this determination on the fact that the remark was not made directly to Barker, that it was an isolated statement for which McMillen later apologized, and that it was neither a direct challenge to Barker’s authority nor did it undermine employee discipline. J.A. at 396. Because of this different weighting of the third factor, the Board overturned the ALJ’s conclusion and found that on the balance of the factors McMillen was entitled to the protection of the Act. J.A. at 396-97.
We disagree. The Board overreached as a matter of law in finding that the conduct in question was not so egregious as to forfeit the protection of the Act. The dissent accuses us of engaging in de novo fact-finding to arrive at this conclusion. See infra at 190-91. It is, however, tellingly unable to point to a single instance in which such fact-finding occurs despite progressively more expansive rhetoric. It does not and cannot dispute, for instance, that McMillen had never read Barker’s November 9 letter or that McMillen’s comment concerning Barker was made in a meeting he initiated during an ordinary shift and not physically or temporally connected to the site of the ongoing labor negotiations.[5] The dissent’s repeated (and heated) mischaracterization of our opinion attempts to mask the fact that what it *188 actually disputes is our interpretation of the facts and the legal conclusions of the Board. Our opinion today finds that the Board erred as a matter of law — which is precisely the sort of review we, as a circuit court, are required to conduct.
The lack of concurrence between Barker’s lawful letter and McMillen’s comment particularly disfavors protection. This was not a spontaneous outburst in response to an illegal threat but an ad hominem attack made in the context of a discussion McMillen initiated with two supervisors. It was a response to an undis-putedly legal letter issued in exercise of the company’s rights. In addition, McMil-len had not even read the letter in question, which further divorces his derogatory remark from the context of the ongoing labor dispute and thus makes the remark of a nature less eligible for protection. See Trus Joist MacMillan, 341 N.L.R.B. at 371 (no protection for “offensive outburst [that] was not a spontaneous or reflexive reaction”). “[I]nsulting, obscene personal attacks by an employee against a supervisor need not be tolerated,” even when they occur during otherwise protected activity. Care Initiatives, 321 N.L.R.B. at 151 (internal punctuation omitted) (quoting Caterpillar Tractor Co. v, Wagner, 276 N.L.R.B. 1323, 1326 (1985)).
It is also of particular significance, as we have noted, that McMillen made his derogatory remark in response to a series of lawful letters sent by his employer. Thus, the fourth factor of the Atlantic Steel test weighs more than slightly against extending the Act’s protection. See J.A. at 396. The lawfulness of the employer’s actions also distinguishes this case from others in which the Board has extended much greater latitude to employees who are reacting to patently unlawful actions by their employers. See Care Initiatives, 321 N.L.R.B. at 152 (“[A]n employer may not rely on employee conduct that it has unlawfully provoked as a basis for disciplining an employee.” (quoting NLRB v. SW. Bell Tel. Co., 694 F.2d 974, 978 (5th Cir.1982))); see also Stanford N.Y., 344 N.L.R.B. at 559 (brief profanity was protected where it was a “direct and temporally immediate response” to unlawful threats by a supervisor). Compare Severance Tool Indus., Inc., 301 N.L.R.B. 1166, 1170 (1991) (holding that, notwithstanding his “disrespectful, rude, and defiant demeanor and the use of a vulgar word,” an employee was not denied the protection of the Act where such actions were a direct response to threats made against unionized employees by the supervisor to whom the disrespect was shown), with Fibracan Corp. v. Amalgamated Clothing and Textile Union, 259 N.L.R.B. 161, 161 (1981) (upholding the dismissal of a worker for “repeated and blatant use of profanity” toward her supervisor where it was used in response to an inquiry about prior profanity, not in response to the employer’s illegal suspension of workers following a lawful walkout).
The Board has “expressly disavowed any rule whereby otherwise protected activity ‘would shield any obscene insubordination short of physical violence’ ” from legal disciplinary action. Felix Indus, v. NLRB, 251 F.3d 1051, 1055 (D.C.Cir.2001) (quoting Atlantic Steel, 245 N.L.R.B. at 817). The balancing test set forth by the Board in Atlantic Steel recognizes that “in the heat of discussion” employees may use strong language that would be wholly inappropriate in other contexts where there is greater leisure for reflection. 245 N.L.R.B. at 816. The Act’s protections are not limitless, however, and where they do not reach, employers cannot be compelled to tolerate language or behavior that undermines workplace discipline. *189 Trus Joist MacMillan, 341 N.L.R.B. at 371 (“Employers and employees have a shared interest in maintaining order in the workplace, an order that is made possible by maintaining a certain level of decorum.”); cf. Felix Indus., 251 F.3d at 1054-55 (explaining that words alone can be sufficiently violative of these concerns so as to lose the protection of the Act). It was not a remark made in the heat of negotiation — or even in direct response to Barker’s legal communications, for McMil-len had not even read the latest letter. We do not disparage the importance of the protections provided for employee speech by the Act. But in this case, McMillen’s opprobrious ad hominem attack on a supervisor made at a point temporally remove from and concerned only with lawful behavior by the employer falls outside the zone of protection.
III.
Because of the inexplicably hyperbolic tenor of the dissent, we think it useful to reiterate the confines of our decision. Characterized accurately, it is far from the ukase the dissent apparently believes it to be.
We do not, for instance, say, as the dissent suggests, that employee conduct is protected only at the physical site of labor negotiations. Nor do we define the parameters of an employee’s protected response to illegal conduct by his or her employer. Those cases are simply not before us.
Rather, we base our decision in this case on the totality of the undisputed facts as found by the ALJ. On that basis, we hold that there is no protection for McMillen’s profane remark regarding his employer, which was directed to his supervisors, during work hours and in the work place, occurred in a conversation McMillen himself initiated regarding an accurate and legal letter he had never read, and the setting of which was physically and temporally removed from the site of ongoing collective bargaining negotiations.
The Board did not, in this case, merely apply the law as it existed. Rather, it expanded the Atlantic Steel factors to essentially create a buffer around employee conduct that would travel with the employee wherever he goes and for as long as some form of collective bargaining can be said to be taking place. That ruling would significantly expand the parameters of our extant law, pushing its borders beyond the language of the Act. The principles of Atlantic Steel remain valid and provide important protections for employees. In this case, however, McMillen’s action in response to the legal expression of his employer simply is of such a nature that it forfeits those protections.
rv.
For the reasons set forth above, we reach the conclusion that the Board erred as a matter of law in finding McMillen’s conduct protected by the Act. We therefore reverse the judgment of the Board and reinstate the opinion of ALJ Biblowitz. As a result, we deny the cross-petition for enforcement of the Board’s decision.

PETITION FOR REVIEW GRANTED; CROSS-PETITION FOR ENFORCEMENT DENIED

. Hereinafter references to "the Tribune” will be to the publisher unless otherwise noted.

. The Pressroom Office Rules make violation of any rule an offense punishable by "disciplinary actions, up to, and including termination." Rule 9 bars, among other things, the use of "[threatening, abusive, or harassing language ... disorderly conduct ... and all disturbances interfering with employees at work anywhere in the building." J.A. at 373.

. The ALJ found that McMillen made this admission in an unprompted response to a statement by Kerr and not in response to a question. Because the decision had already been made to terminate McMillen before the meeting began and because Kerr did not question McMillen about his statement, the ALJ concluded and the Board agreed that McMillen had no right to union representation at the meeting and that the Tribune therefore did not violate section 8(a)(1) of the Act with respect to the denial of representation. J.A. at 379-80, 394. This holding is not challenged on appeal.

. In balancing the Atlantic Steel factors, the Board has in general found that remarks made in private are less disruptive to workplace discipline than those that occur in front of fellow employees. See, e.g., Stanford N.Y., 344 N.L.R.B. at 558 (finding that "[t]he relatively secluded room and ... [the employee’s] efforts to maintain the privacy of the conversation weighs in favor of [the Act's] protection”). We note, however, that when a discussion is instigated for the express purpose of making vulgar remarks, the privacy of the location may factor into the balance differently. Compare id., with Trus Joist MacMillan, 341 N.L.R.B. at 370 (noting that while "[i]n one respect the [private] locus of ... [the] outburst was one that would have a less disruptive effect than it would have if it had occurred on the plant floor[J .... in another respect, the locus accentuated and exacerbated the insubordinate nature of ... [the employee's] offensive outbursts” because the employee's purpose in requesting a meeting was to "embarrass” his supervisor in front of management).

. We note, in passing, that in its recitation of the "facts” that we "find,” the dissent also makes the same analytical mistake of which it accuses us: namely, it conflates facts concerning whether or not an individual is engaged in concerted activity with those concerning whether or not a particular statement maintains the protection of the Act.