**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PLAZA AUTO CENTER, INC.,
    *Petitioner/Cross-Respondent,*

v.

NATIONAL LABOR RELATIONS
BOARD,
    *Respondent/Cross-Petitioner.*

Nos. 10-72728
10-73125

NLRB No.
28-CA-22256

OPINION

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

Argued and Submitted
October 27, 2011—San Francisco, California

Filed December 19, 2011

Before: Susan P. Graber and Sandra S. Ikuta, Circuit Judges,
and Gordon J. Quist,* Senior District Judge.

Opinion by Judge Quist

---

*The Honorable Gordon J. Quist, United States District Judge for the
Western District of Michigan, sitting by designation.

21025

## COUNSEL

Stephanie R. Leach, Snell & Wilmer, L.L.P., Phoenix, Arizona, for the petitioner.

Jill A. Griffin and Kira Dellinger Vol, National Labor Relations Board, Washington, D.C., for the respondent.

## OPINION

QUIST, District Judge:

Plaza Auto Center, Inc. ("PAC" or "company") seeks review of an order of the National Labor Relations Board (the "Board") holding that PAC violated section 8(a)(1) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1), by firing employee Nick Aguirre ("Aguirre") for his outburst during a meeting with PAC management regarding PAC's compensation policies. Applying the four-factor

test in *Atlantic Steel Co.*, 245 N.L.R.B. 814 (1979), the Board concluded that in spite of his inappropriate remarks toward PAC's owner, Aguirre did not lose his statutory protections under the Act. The Board has filed a cross-application for enforcement of its order, including its finding that PAC repeatedly violated the Act by inviting Aguirre to quit in response to his protected activities.

We have jurisdiction pursuant to 29 U.S.C. § 160(e) and (f). For the reasons set forth below, we grant PAC's petition for review and remand to the Board to balance the *Atlantic Steel* factors in light of our discussion below. We also grant the Board's petition for enforcement of Paragraphs 1 and 2(d)-(e) of the order.

## BACKGROUND

PAC sells used cars in Yuma, Arizona, and is owned by Tony Plaza ("Plaza"). PAC has two sales managers, Juan Felix ("Felix") and Gustavo MacGrew ("MacGrew"), and an officer manager, Barbara Montenegro ("Montenegro"). PAC hired Aguirre as a salesman at the end of August 2008. During Aguirre's brief employment with PAC, which ended on October 28, 2008, PAC conducted three-day weekend tent sales in a Sears parking lot. Also during that time, Felix and MacGrew held weekly meetings for the sales staff.

On his first day with PAC, Aguirre worked at a tent sale. During his shift, when Aguirre inquired about bathroom facilities, Felix pointed to the Sears store and a gas station across the street. In a sales meeting the following week, Aguirre asked whether salespeople could take a break to use the bathroom and eat a meal during tent sales. Felix responded, "you're always on break buddy . . . you just wait for customers all day." Felix also told Aguirre that he was free to leave at any time if he did not like the company's policies.

During PAC's next tent sale in mid-September, Aguirre spoke with other salespeople about PAC's compensation pol-

icy. They informed Aguirre that salespeople were paid a straight commission with no draw or guaranteed minimum. In other words, salespeople were not paid the minimum wage and had to rely solely on their sales commissions. Aguirre also raised the issue of a system for salespeople to alternate bathroom breaks, but when Aguirre asked Felix for a break to use the bathroom and get something to eat, Felix refused, reiterating that the salespeople were "always on a break."

At the next sales meeting, an employee other than Aguirre raised the issue of compensation. MacGrew responded that if employees did their jobs correctly and followed all of the procedures, they would make money. Sometime thereafter, Aguirre sold a vehicle listed on the company's "flat list"—a list of vehicles that carried a special commission because they were difficult to sell. A similar vehicle was listed on the "flat list" with a commission of between $1,000 to $2,000. To Aguirre's surprise, however, he received a check for only $150. His fellow employees agreed that it was unfair. Aguirre confronted Felix about the size of the check, but Felix told Aguirre that the commission was low because he had given the vehicle away almost for free.

At another sales meeting, Plaza informed the salespeople that he was going to deduct the repair costs for a damaged vehicle equally from all salespeople's paychecks if no one admitted responsibility. Aguirre responded that it would be unfair to charge only the salespeople instead of all employees who had access to the vehicle. Plaza then spoke about employee negativity and stated that he had a stack of applications from prospects whom the company could easily hire as salespeople.

In October, at another tent sale, Aguirre asked Felix which vehicles would produce a good commission because Aguirre thought that the company was stealing money from him in calculating his commissions. Felix responded that Aguirre was welcome to go elsewhere if he did not trust the company.

Around the same time, Aguirre obtained information relating to PAC's compensation system from Arizona's wage and hour agency. Aguirre told his coworkers that the agency advised him that the salespeople were entitled to the minimum wage as a draw against commissions and that he intended to speak with PAC's office manager, Montenegro, about this issue.

On October 28, Aguirre asked Montenegro whether PAC's salespeople were entitled to a minimum-wage draw. Montenegro responded that the company did not pay minimum wage and that Aguirre should work elsewhere if he wanted a minimum-wage job. Aguirre informed Montenegro that he had spoken with the state wage agency about a draw and asked her to look into the issue, perhaps by asking Plaza.

Later that afternoon, on October 28, Felix informed Plaza that Aguirre complained about everything all the time and wanted to know PAC's vehicle costs because he did not trust the company's calculation of his sales commissions. Felix then called Aguirre into Felix's office to meet with Felix, MacGrew, and Plaza. At the beginning of the meeting, Plaza had no intention of firing Aguirre. Plaza began the meeting by telling Aguirre that he was "talking a lot of negative stuff" that would negatively affect the sales force and he was asking too many questions. Aguirre responded that he had questions about vehicle costs, commissions, and minimum wage. Plaza told Aguirre that he had to follow the company's policies and procedures, that car salespeople normally do not know the dealer's cost of vehicles, and that he should not be complaining about pay. Plaza twice told Aguirre that if he did not trust the company, he need not work there. At that point, Aguirre lost his temper and in a raised voice started berating Plaza, calling him a "fucking mother fucking," a "fucking crook," and an "asshole." Aguirre also told Plaza that he was stupid, nobody liked him, and everyone talked about him behind his back. During the outburst, Aguirre stood up, pushed his chair

aside, and told Plaza that if Plaza fired him, Plaza would regret it. Plaza then fired Aguirre.

Following an evidentiary hearing, an administrative law judge ("ALJ") found that PAC had violated section 8(a)(1) several times by inviting Aguirre to quit in response to his protected protests of working conditions. As to the discharge, however, the ALJ applied *Atlantic Steel Co.* and concluded that, although Aguirre was engaged in protected activity during the October 28 meeting, his obscene remarks and personal attacks on Plaza cost him the Act's protection.

The General Counsel filed exceptions regarding the discharge. Over a dissent, the Board concluded that Aguirre's conduct was not so severe as to cause him to lose his statutory protection. The Board thus held that PAC had violated section 8(a)(1) by firing Aguirre and reversed the ALJ's order on that issue.

## DISCUSSION

### I.  PAC's Petition for Review of the Board's Order Regarding the Discharge

### A.

"This court will enforce an NLRB order if the Board correctly applied the law and if its factual findings are supported by substantial evidence in the record as a whole." *Sierra Publ'g Co. v. NLRB,* 889 F.2d 210, 215 (9th Cir. 1989). The substantial evidence test requires us to evaluate the entire record to determine whether "it would have been possible for a reasonable jury to reach the Board's conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366-67 (1998). Our review is more "searching" in instances where the Board's findings or conclusions are contrary to those of the ALJ. *United Steel Workers of Am. AFL-CIO-CLC v. NLRB*, 482 F.3d 1112, 1117 (9th Cir. 2007); *UAW v. NLRB*, 834 F.2d

816, 819 (9th Cir. 1987). The ALJ's findings become part of the record to be reviewed along with other evidence contrary to the Board's opinion. *NLRB v. Searle Auto Glass, Inc.*, 762 F.2d 769, 773 (9th Cir. 1985). However, the Supreme Court has observed that "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951).

## B.

**[1]** The issue for review is whether Aguirre forfeited the protection of the Act because of his conduct during the October 28 meeting.[1] "[W]here an employee engages in indefensible or abusive conduct, his concerted activity will lose the protection of the Act." *Trus Joist MacMillan*, 341 N.L.R.B. 369, 370 (2004); *see also Media Gen. Operations, Inc. v. NLRB*, 560 F.3d 181, 186 (4th Cir. 2009) ("Even concerted actions that are assumed to be protected by the Act may forfeit such protection if they are 'egregious or flagrant.' " (quoting *Care Initiatives, Inc.*, 321 N.L.R.B. 144, 151 (1996))). To determine whether an employee' s conduct results in a loss of protection, the Board considers the following factors: "(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by the employer's unfair labor practice." *Atl. Steel Co.*, 245 N.L.R.B. at 816. The Board must "carefully balance" these factors and,

---

[1]PAC argues that the termination was proper under the analysis set forth in *Wright Line*, 251 N.L.R.B. 1083 (1980). The Board concluded that a *Wright Line* analysis was unnecessary because PAC's motivation was not at issue—it was undisputed that PAC fired Aguirre because of his outburst during the October 28 meeting. Because PAC's motivation was not at issue, this conclusion was correct. *Honda of Am. Mfg., Inc.*, 334 N.L.R.B. 751, 753 (2001); *see also Felix Indus.*, 331 N.L.R.B. 144, 145-46 (2000), *enforcement denied on other grounds by* 251 F.3d 1051 (D.C. Cir. 2001).

where doing so shows that the employee engaged in "opprobrious conduct," the employee loses the protection of the Act. *Id.* These considerations recognize that "[e]mployers and employees have a shared interest in maintaining order in the workplace, an order that is made possible by maintaining a certain level of decorum." *Trus Joist MacMillan*, 341 N.L.R.B. at 371. Nonetheless, the Act permits some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and discipline. *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965).

The ALJ found that the first, second, and fourth factors weigh against the loss of protection, while the third factor—the nature of the outburst—favors the loss of protection. The ALJ concluded that, under the circumstances, the nature of Aguirre's outburst was such that it resulted in Aguirre's forfeiting the Act's protection. The Board agreed with the ALJ with regard to the first, second, and fourth factors but, finding a lack of support in the record to conclude that Aguirre's conduct was physically threatening or intimidating, as the ALJ had found, the Board concluded that all four *Atlantic Steel* factors weigh in favor of finding that Aguirre retained his protection under the Act.

## 1. *Place of the Discussion*

**[2]** When the discussion occurs in a private location away from the normal work area and other employees, such that it causes no disruption to order or discipline in the workplace, this factor normally weighs in favor of protection. *See, e.g.*, *Stanford Hotel*, 344 N.L.R.B. 558, 558 (2005) (where the meeting was in an employee lunchroom away from the normal work area and the employee closed the door to maintain privacy, the location weighed in favor of protection). The Board and the ALJ concluded that this factor favored continued protection because the meeting occurred in Felix's office away from the workplace and did not affect employee discipline. Nothing in the record undermines this finding.

**[3]**  PAC argues that this factor weighs in favor of a loss of protection because Aguirre requested and initiated the meeting with Plaza with the intent to humiliate Plaza in front of Felix and MacGrew. We reject this argument because nothing in the record suggests that Aguirre planned to humiliate Plaza or any other supervisor at the start of, or before, the meeting or that Aguirre's conduct disrupted PAC's business or undermined employee discipline.² *Trus Joist MacMillan*, which PAC cites, is distinguishable because the employee in that case instigated the meeting for the express purpose of embarrassing a manager in front of other managers, which "accentuate[d] and exacerbate[d] the disruptive effect of [the employee's] outburst." 341 N.L.R.B. at 370. There is no such evidence here.

## 2.  *Subject Matter of the Discussion*

**[4]**  The Board and the ALJ concluded that the second factor favors protection because the subject matter of the meeting concerned Aguirre's complaints related to terms and conditions of employment, including PAC's compensation policies toward its salespeople. PAC concedes that the meeting, at least initially, concerned issues afforded protection under the Act, but it argues that this was no longer true when the subject matter changed to Aguirre's demand to know PAC's vehicle costs, which PAC had no legal obligation to disclose. PAC contends that Aguirre's obscenities and personal attacks were triggered by Plaza's response to Aguirre's demand for this information, rather than anything having to do with protected

---

²There was conflicting evidence regarding who initiated the meeting. Aguirre indicated that management arranged the meeting, stating that Felix directed Aguirre to go into Felix's office. ER 124. Montenegro, on the other hand, testified that Aguirre asked to meet with Plaza to discuss the minimum wage issue. ER 244-45. Neither the ALJ nor the Board resolved this specific issue, although both found that Aguirre asked Montenegro to look into the issue, perhaps by asking Plaza, and that Felix called Aguirre into his office. ER 2,8. In any event, there is no basis for concluding that Aguirre ever asked to meet with anyone other than Plaza.

conduct. We disagree. The topic of vehicle costs was closely related to—in fact intertwined with—Aguirre's concerns about receiving proper compensation. Aguirre's desire to know PAC's costs related directly to PAC's pay structure because his complaint, in part, was that he could verify that his commissions were correct only if he knew what PAC paid for the vehicles. Moreover, as the ALJ observed, Aguirre's outburst was contemporaneous with Plaza's characterization of Aguirre's complaints as "a lot of negative stuff" and his statement that Aguirre should work elsewhere if he did not like or trust the company. ER at 13. Thus, there is no basis to segregate Aguirre's outburst from his protected complaints about PAC's employment policies and practices.

### 3. *Nature of the Outburst*

The Board rejected the ALJ's conclusion that the nature of Aguirre's outburst weighed against protection. The ALJ described Aguirre's outburst as "repeated, extensive, and personally derogatory statements to a supervisor," noting further that "Mr. Aguirre repeatedly reviled Mr. Plaza in obscene and personally denigrating terms accompanied by menacing conduct and language." ER 14. In contrast, while the Board acknowledged that Aguirre "uttered more than a brief profanity against Plaza," it characterized his conduct as a single, brief outburst provoked by Plaza's failure to respond to Aguirre's concerns and Plaza's suggestion that Aguirre work elsewhere. ER 3. Also, finding no evidence of actual or threatened physical harm or aggression, the Board concluded that Aguirre's outburst was "unaccompanied by insubordination, physical contact, threatening gestures, or threat of physical harm." ER 4. Finally, the Board concluded that Aguirre's conduct was not outside the range of acceptable conduct because Felix himself had used obscene language when dealing with employees.

[5] Implicit in the Board's analysis is the suggestion that an employee's outburst does not factor into the loss of the

Act's protection unless accompanied by physical conduct, or at least a threat that is physical in nature. We arrive at this interpretation because the Board seemingly considered immaterial the ALJ's finding that Aguirre personally denigrated Plaza with obscene and insulting language. Aguirre's verbal attack—involving repeated insults and obscenities, all directed at Plaza, as the ALJ found—was not brief and was, in fact, insubordination. The rule the Board seems to espouse is at odds with its own precedents, which recognize that an employee's offensive and personally denigrating remarks alone can result in loss of protection. *See, e.g.*, *Care Initiatives, Inc.*, 321 N.L.R.B. at 151 ("Among the specific types of conduct that could exceed the protection of the Act are vulgar, profane, and obscene language directed at a supervisor or employer, even though uttered in the course of protected concerted activity."). For example, in *Stanford Hotel*, 344 N.L.R.B. at 558, an employee responded to his supervisor's repeated demands that he admit he was not covered under the collective bargaining agreement by calling his supervisor a "liar," a "bitch," and a "f—ing son of a bitch." Although it ultimately decided that the employee retained his protection in light of the other factors, the Board concluded that the employee's obscene and offensive outburst favored a loss of protection. *Id.* at 559; *see also Daimler Chrysler Corp.*, 344 N.L.R.B. 1324, 1328-29 (2005) (concluding that the outburst, in which the employee called his supervisor an "asshole" and stated, "Bullshit, I want this meeting now," "fuck this shit," and that he did not "have to put up with this bullshit" was insubordinate and profane and weighed against protection).

The District of Columbia Circuit had occasion to consider the Board's application of the third *Atlantic Steel* factor in *Felix Industries, Inc. v. NLRB*, 251 F.3d 1051 (D.C. Cir. 2001). In that case, Yonta, a 42-year-old employee, was supervised by Petrillo, a 25-year-old whose father was the president of the company. While at home, Yonta called Petrillo at his office to inquire about not receiving a night shift differential. Petrillo assured Yonta that he would get

"every penny" to which he was entitled, but then told Yonta that he was tired of "carrying" him. Yonta responded that Petrillo was "just a fucking kid" and added, "I don't have to listen to a fucking kid." When Petrillo asked Yonta what he had just called him, Yonta confirmed, "a fucking kid." In response, Petrillo fired Yonta. An ALJ concluded that Yonta lost his protection, but the Board disagreed, finding that " 'Yonta's conduct consisted of a brief, verbal outburst of profane language, unaccompanied by any threat or physical gestures or contact.' " *Id.* at 1054 (quoting the Board's decision). The court observed that the Board's rationale contradicted *Atlantic Steel*, in which it disavowed any rule "whereby otherwise protected activity would shield any obscene insubordination short of physical violence." *Id.* at 1055 (internal quotation marks omitted). Thus, the court reasoned, "[i]f an employee is fired for denouncing a supervisor in obscene, personally-denigrating, or insubordinate terms—and Yonta here managed all three with economy—then the nature of his outburst properly counts against according him the protection of the Act." *Id.* The court remanded the matter for the Board to conduct a proper balancing, with Yonta's statements weighing against protection. *Id.*

**[6]** The Board's explanation here is similar to its reasoning in *Felix Industries*. But Aguirre's outburst, even if brief, was no less obscene, degrading, and insubordinate than Yonta's outburst toward his supervisor. Even in that brief moment, as the Board characterized it, Aguirre called Plaza a "fucking mother fucking," a "fucking crook," and an "asshole" and told him that he was stupid, that nobody liked him, and that everyone talked about him behind his back. This conduct alone counts against Aguirre's retaining protection. Thus, like the *Felix Industries* court, we find it necessary to remand this matter to the Board to allow it to properly consider whether the nature of Aguirre's outburst caused him to forfeit his protection. *See Trus Joist MacMillan*, 341 N.L.R.B. at 371-72 (concluding that the third *Atlantic Steel* factor alone may carry enough weight to forfeit the Act's protection).

The Board argues that we still should conclude that it properly balanced the factors because it stated that it would have reached the same result even if the third factor weighs against protection. But the reasoning supporting that statement is internally inconsistent. After stating that it was *adopting* the ALJ's *credibility* and factual findings regarding the October 28 meeting, the Board *rejected* the ALJ's findings that Aguirre's conduct was "belligerent," "menacing," and "at least physically aggressive if not menacing." In another, similarly inconsistent statement, the Board claimed to rely on the ALJ's findings in concluding that Aguirre's outburst did not amount to a threat of physical harm. But, the belligerence finding was essentially a credibility finding: the only evidence regarding the nature of the outburst was the competing testimony of Aguirre and PAC's witnesses. The ALJ expressly determined that Aguirre's testimony was incongruous and "not as believable" as the PAC witnesses' testimony, and she did not credit Aguirre's account of the October 28 meeting where it conflicted with the accounts of the three PAC supervisors. Thus, it was precisely because the ALJ gave more credence to the testimony of the PAC witnesses that she found the outburst was physically aggressive and menacing.

We cannot be sure whether this inconsistent logic colored the Board's statement regarding how it would balance the factors if the third factor weighed in favor of lost protection. In other words, although the Board stated that it would have reached the same result even if Aguirre's outburst, as the Board characterized it, weighed in favor of lost protection, we cannot be sure that the Board would have reached the same result had it adopted the ALJ's finding that Aguirre's outburst involved physically aggressive and menacing conduct. Accordingly, we remand this case to the Board to re-balance the *Atlantic Steel* factors as discussed in this opinion. In doing so, the Board should either (1) reject, with a reasoned explanation, the ALJ's credibility and factual findings regarding the October 28 meeting, or (2) adopt those findings in their entirety, including the finding regarding belligerence.

### 4. *Provocation by Unfair Labor Practices*

**[7]** The Board agreed with the ALJ that the fourth factor weighs in favor of protection because Aguirre's outburst was contemporaneous with both Plaza's censure of Aguirre's protected activities as "a lot of negative stuff" and Plaza's unfair labor practice of suggesting that Aguirre could work elsewhere if he did not like the company's policies. The Board's conclusion on this factor, like its conclusion on the second factor, is well supported. PAC nonetheless argues that this factor weighs in favor of loss of protection, once again advancing its contention that the outburst was provoked by Plaza's lawful statement that he would not disclose information regarding the price of cars. We reject this argument for the reasons cited above.

## II.  Application for Summary Enforcement

**[8]** The Board is entitled to enforcement of the portion of its order finding that PAC management violated section 8(a)(1) of the Act in several instances by inviting Aguirre to quit in response to his protected inquiries. PAC's failure to challenge before the Board the ALJ's finding on this issue means that "the Board's finding of those unfair labor practices violations must be taken as established." *NLRB v. Advanced Stretchforming Int'l, Inc.*, 233 F.3d 1176, 1180 (9th Cir. 2000) (internal quotation marks omitted).

### CONCLUSION

For the foregoing reasons, we remand to the Board for proper balancing of the *Atlantic Steel* factors in light of our conclusion that the Board erred in its initial assessment that the nature of Aguirre's outburst weighs in favor of protection. As we have explained, under the Board's own precedents, obscene, degrading, and insubordinate comments may weigh in favor of lost protection even absent a threat of physical harm. In addition, the Board should give full effect to the

ALJ's factual and credibility findings, including the finding that Aguirre's behavior was menacing or at least physically aggressive in that small room, unless "the clear preponderance of *all* the relevant evidence convinces" the Board that they are incorrect. *Standard Dry Wall Prods.*, 91 N.L.R.B. 544, 545 (1950), *enforced by* 188 F.2d 362 (3d Cir. 1951). Finally, we grant the Board's petition for enforcement of the order with regard to the Board's findings that PAC committed unfair labor practices by inviting Aguirre to quit in response to his protected concerted protests of labor conditions. Accordingly, Paragraphs 2(a)-(c) of the Board's order are vacated, and Paragraphs 1 and 2(d)-(e) are enforced.

The parties shall bear their own costs on appeal.

**PETITION GRANTED AND REMANDED; ORDER ENFORCED IN PART**.