**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DELTA SANDBLASTING COMPANY,
INC.,

               *Petitioner*,

        v.

NATIONAL LABOR RELATIONS
BOARD,

              *Respondent*,

DISTRICT COUNCIL 16 OF THE
INTERNATIONAL UNION OF PAINTERS
AND ALLIED TRADES,

        *Respondent-Intervenor.*

No. 18-73097

NLRB Nos.
20-CA-176434
32-CA-180490

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, DISTRICT COUNCIL 16,

*Petitioner-Intervenor*,

v.

DELTA SANDBLASTING COMPANY, INC.,

*Respondent.*

No. 18-73305

NLRB Nos. 20-CA-176434 32-CA-180490

OPINION

On Petition for Review of an Order of the National Labor Relations Board

Argued and Submitted March 6, 2020 San Francisco, California

Filed August 11, 2020

Before: KIM MCLANE WARDLAW, MILAN D. SMITH, JR., and PATRICK J. BUMATAY, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.; Dissent by Judge Bumatay

## SUMMARY[*]

# Labor Law

The panel denied Delta Sandblasting Company, Inc.'s petition for review, and granted the National Labor Relations Board's cross-petition for enforcement of its order ruling that Delta committed an unfair labor practice when it decreased its employees' hourly pension contribution rate to the Pacific Coast Shipyards Pension Fund without first notifying or bargaining with their union.

Specifically, Delta argued that the Board erred in ruling that Section 302(c)(5)(B) of the Labor Management Relations Act did not prohibit Delta from making pension contributions to the Pension Fund according to the rates contained within a schedule (Schedule A) that the Board found was incorporated into the collective bargaining agreement (CBA) between Delta and the Union.

The panel held that substantial evidence supported the Board's finding that Schedule A was incorporated into the CBA in December 2014. Further, the panel affirmed the Board's conclusion that the CBA, which incorporated Schedule A, met Section 302's requirements. The panel held that the Board properly ruled that Section 302's requirement of a "written agreement" defining pension contributions was satisfied here. Finally, the panel held that Delta's failure to notify or bargain with its union over the pension contribution

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

rate decrease was an unfair labor practice under Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act.

Dissenting, Judge Bumatay would hold that the Board owed a reasoned explanation for its departure from the administrative law judge ("ALJ")'s findings, and the Board fell far short of that here. Judge Bumatay would grant Delta's petition for review and remand to the Board to reassess its conclusion in light of the ALJ's express finding regarding the base pension rate of the CBA.

## COUNSEL

Alan S. Levins (argued) and Courtney M. Osborn, Littler Mendelson P.C., San Francisco, California, for Petitioner/Respondent Delta Sandblasting Company, Inc.

Barbara A. Sheehy (argued) and Gregoire Sauter, Attorneys; Usha Dheenan, Supervisory Attorney; David Habenstreit, Acting Deputy Associate General Counsel; Alice B. Stock, Associate General Counsel; Peter B. Robb, General Counsel; National Labor Relations Board, Washington, D.C.; for Respondent/Petitioner National Labor Relations Board.

David A. Rosenfield (argued) and Caroline N. Cohen, Weinberg Roger & Rosenfeld, Alameda, California, for Respondent-Intervenor/Petitioner-Intervenor.

**OPINION**

M. SMITH, Circuit Judge:

Petitioner Delta Sandblasting Company, Inc. (Delta) appeals the National Labor Relations Board's (the Board) order ruling that it committed an unfair labor practice when, in March 2016, it decreased its employees' hourly pension contribution rate to the Pacific Coast Shipyards Pension Fund (the Pension Fund) without first notifying or bargaining with their union (the Union).[1] Specifically, Delta argues that the Board erred in ruling that Section 302(c)(5)(B) (Section 302) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5)(B), did not prohibit Delta from making pension contributions to the Pension Fund according to the rates contained within a schedule (Schedule A) that the Board found was incorporated into the collective bargaining agreement (CBA) between Delta and the Union.[2]

---

[1] Delta's employees are represented by Auto, Marine & Specialty Painters Local 1176 (Local 1176). Local 1176 is an affiliate of District Council 16 of the International Union of Painters and Allied Trades (District Council), which first brought the charges in the underlying NLRB case and has intervened in this appeal on behalf of the Board. For simplicity, herein we use "the Union" to refer to both the District Council and Local 1176, unless it is necessary to distinguish either entity.

[2] Schedule A's rates were paid by Delta as follows: (1) $8.18 per hour from April 2014 through December 2014; and (2) $9.78 per hour from January 2015 through December 2015. The record does not indicate what pension contribution rates Delta paid between January 2009 and March 2014. While Delta paid at the rate of $11.38 per hour in January and February 2016, the Board's order deferred deciding whether Delta's payment of an additional $1.60 per hour in those two months met the requirements of Section 302. Because the Board did not

We deny Delta's petition for review and grant the Board's cross-application for enforcement of its order. The Board properly ruled that Section 302's requirement of a "written agreement" defining pension contributions was satisfied here, and that Delta's failure to notify or bargain with its union over the pension contribution rate decrease was an unfair labor practice under Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1), (5).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Relevant Bargaining History

Delta is a Petaluma, California-based subcontractor that provides marine vessel painting and sandblasting services. During the period under review, Delta was owned and operated by James "Bobby" Sanders, Sr. (Sanders), who negotiated pension issues directly with the Union. José Santana oversees the Union, has been responsible for negotiating with Delta since 2008, and is a trustee of the Pension Fund. The Union and Sanders negotiated in an informal manner, often following the terms of the collective bargaining agreement between the District Council and BAE (a larger company for which Delta acted as a subcontractor). Prior to 2014, Delta paid its employees more than BAE paid its employees, which obviated the need for annual renegotiations between Delta and the Union.

The dispute in this case arose in March 2016, when Delta, without prior notice to the Union, ceased paying

---

address this issue in its order and the parties did not brief it on appeal, we do not address it here. *See Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986) (declining to consider claims not "specifically and distinctly argued" in the appellate briefing).

pension contributions in accordance with Schedule A, and reduced its monthly contribution rate to $1.95 per hour.  In a letter to the Pension Fund explaining its reduced payment, Delta stated, "[w]e do not have the money at this time to pay the mandatory (critical status) amount due."

The Board, the Union, and Delta (the Parties) agree that the CBA between Delta and the Union expired on August 31, 2015, and pursuant to well-established caselaw, continues to govern the relationship between Delta and the Union. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991).  In addition, the Parties agree that the CBA's Article 18.1[3] obligates Delta to make pension contributions to the Pension Fund, and that, between December 2014 and through the expiration of the CBA, Delta made those contributions in accordance with the rates contained in Schedule A.  Relatedly, the Parties agree that, before 2009, Delta made pension contributions at a rate of $1.95 per hour, pursuant to a wage schedule contained within a previous version of the CBA (the 2008 Schedule A).  Finally, the Parties agree that the Pension Fund declared itself in critical status pursuant to the Pension Protection Act of 2006 (PPA), 29 U.S.C. § 1085, and that a rehabilitation plan (the Rehabilitation Plan) for the Pension Fund, with annually

---

[3] In pertinent part, Article 18.1 reads:

> The Employer will pay the following . . . Pension contributions to the applicable jointly administered Trusts (i.e. . . . Pension – Pacific Coast Shipyards Pension Fund) for all actual hours worked during the term of this Agreement.
>
> Pension
>
> *See Wage Schedule "A"*

updated pension contribution rate schedules, has been in effect since 2008.**[4]**

On appeal, Delta argues that the Board erred in rejecting its argument that Section 302, which requires that pension contributions be made pursuant to a "written agreement," prohibited it from paying pension contributions according to Schedule A, and that Delta is only obligated by written agreement to pay the 2008 pension contribution rate of $1.95 per hour. The Board and the Union, in contrast, argue that the CBA, which they contend incorporated Schedule A in 2014, satisfies Section 302's "written agreement" requirement.

## II. ALJ Decision

In response to the change in Delta's pension contribution rate, the District Council filed a charge against Delta with the NLRB on May 16, 2016, and the NLRB's General Counsel filed a complaint soon after.**[5]** On September 15, 2017, the Administrative Law Judge (ALJ) concluded that Delta's unilateral pension rate reduction, made without giving the Union notice or an opportunity to bargain, constituted an unfair labor practice pursuant to Sections 8(a)(1) and (5) of the NLRA.

---

**[4]** The Rehabilitation Plan's updated rate schedules for 2014 and 2015 match Schedule A's pension contribution rates for 2014 and 2015. While Schedule A does not specify pension contribution rates for years beyond 2015, the Rehabilitation Plan's schedules do.

**[5]** The District Council, and later the NLRB General Counsel, also alleged that Delta committed an unfair labor practice by failing to execute a new collective bargaining agreement governing the years 2015–2018. This charge was rejected by the ALJ and the Board and is not at issue in this appeal.

The ALJ did not rule whether Delta's pension contributions before March 2016 violated Section 302's "written agreement" requirement. Instead, relying upon the Board's ruling in *Quality House of Graphics, Inc.*, 336 N.L.R.B. 497, 498–99 (2001), the ALJ held that, irrespective of the legality of the pension contribution rates pursuant to Section 302, Delta's failure to notify and bargain with the Union before decreasing its contribution rates was an unfair labor practice. The ALJ ordered Delta to make "all such delinquent contributions" that had not been made to the Pension Fund since April 2016 and to continue making them until it bargained with the Union in good faith to a contrary agreement or a bona fide impasse. The ALJ allowed Delta to "prove at compliance that resuming its surcharge contributions would violate Section 302."

## III.    Board Decision

The Union and Delta each filed exceptions to the ALJ's ruling.[6] On October 16, 2018, a three-member panel of the Board (Chairman Ring, and Members McFerran and Kaplan) adopted the ALJ's "rulings, findings, and conclusions as modified [in the Board's decision and order]," and agreed with the ALJ's conclusion that Delta's unilateral pension contribution rate reduction was an unfair labor practice. In contrast to the ALJ, the Board considered and rejected Delta's defense that payment of pension contributions according to Schedule A was unlawful pursuant to Section 302.[7] The Board found that Schedule A

---

[6] The Union's exceptions concerned the ALJ's ruling on a different issue that is not on appeal.

[7] The Board also modified the ALJ's remedial order, dating the delinquent pension contributions back to March 2016, rather than April 2016.

was incorporated into the CBA.  Finally, the Board found that, at the time of its expiration, the CBA obligated Delta to make pension contributions at a rate of $9.78 per hour, and left undecided whether Delta was required to pay rates higher than that after the expiration of the CBA.

Delta timely petitioned for review of the Board's order pursuant to Section 10(f) of the NLRA.**[8]**  The NLRB General Counsel filed an application for enforcement of the Board's order on December 7, 2018.  On December 31, 2018, the District Council intervened in support of the General Counsel.  Delta's petition and the NLRB General Counsel's application were consolidated on January 10, 2019.

## JURISDICTION

The Board had jurisdiction over the underlying unfair labor practice proceeding pursuant to 29 U.S.C. § 160(a).  We have jurisdiction over Delta's petition for review and the Board's cross-application for enforcement, both timely, pursuant to 29 U.S.C. § 160(e) and (f).

## ANALYSIS

The Board rejected Delta's Section 302 defense, concluding that the CBA, which it found incorporated Schedule A, met Section 302's "written agreement" requirement.  On appeal, Delta argues that the Board's

---

**[8]** There is no defined time limitation for the filing of a petition for review. *Griffith Co. v. NLRB*, 545 F.2d 1194, 1197 n.3 (9th Cir. 1976). Instead, according to the principles of laches, we ask that "the party challenging the timeliness of a petition must show that more time has elapsed than reasonably necessary and that it was prejudiced by the delay." *Id.* Here, Delta's petition was filed within 60 days of the Board's order.  The Board and Union do not challenge its timeliness.

finding that the CBA incorporated Schedule A was not based upon substantial evidence. Instead, Delta argues, the 2008 Schedule A, which provides a rate of $1.95 per hour, was the last-agreed pension contribution schedule. Moreover, Delta argues that, even if we were to consider Schedule A as part of the CBA, it does not satisfy Section 302.

Below, we analyze the Board's factual finding that Schedule A was incorporated into the CBA using the substantial evidence standard of review. We then review de novo the Board's legal conclusion that the CBA, incorporating Schedule A, satisfied Section 302.

## I.   The Board's finding that Schedule A was incorporated into the CBA

The NLRA authorizes the Board to make findings of fact and conclusions from the record, 29 U.S.C. § 160(c), and to review the ALJ's findings of fact de novo, *see Penasquitos Vill., Inc. v. NLRB*, 565 F.2d 1074, 1076 (9th Cir. 1977) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951)). While the Board is empowered to review an ALJ's credibility findings de novo, according to Board policy it avoids doing so unless the "clear preponderance of *all* the relevant evidence" convinces the Board the findings are incorrect. *Anja Eng'g Corp. v. NLRB*, 685 F.2d 292, 295 n.8 (9th Cir. 1982) (emphasis added) (citing *Standard Dry Wall Prods.*, 91 N.L.R.B. 544, 544–45 (1950), *enforced*, 188 F.2d 362 (3d Cir. 1951)), *overruled on other grounds by Raley's, Inc. v. NLRB*, 725 F.2d 1204, 1206 (9th Cir. 1984).

In contrast, we uphold the Board's factual findings if they are supported by substantial evidence. *Glendale Assocs., Ltd. v. NLRB¸* 347 F.3d 1145, 1151 (9th Cir. 2003). "'Substantial evidence' is 'more than a mere scintilla, but less than a preponderance.'" *NLRB v. Int'l Bhd. of Elec.*

*Workers, Local 48*, 345 F.3d 1049, 1053–54 (9th Cir. 2003) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). Concerning factual findings, "[a] reviewing court may not displace the NLRB's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Walnut Creek Honda Assocs. 2, Inc. v. NLRB*, 89 F.3d 645, 648 (9th Cir. 1996) (quoting *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1005 (9th Cir. 1995)). The Board's credibility findings are entitled to special deference and may only be rejected when a clear preponderance of the evidence shows that they are incorrect. *See United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 777 (9th Cir. 2017) ("A court will not reverse the Board's credibility determinations unless they are 'inherently incredible or patently unreasonable.'" (quoting *Retlaw*, 53 F.3d at 1006)).

Substantial evidence in the record supports the Board's finding that Schedule A was incorporated into the CBA by Sanders and Santana in December 2014. Before the ALJ, Santana testified, and the ALJ did not discredit, that he inserted Schedule A into the CBA and that Sanders agreed to Schedule A at a December 1, 2014 meeting. Santana testified that during the meeting, Sanders asked him to modify the start date on the schedule from July 1, 2014 to December 1, 2014, which he did. Moreover, Schedule A was produced by Delta before the ALJ, and Sanders's wife, Joyce Sanders,[9] testified that Sanders gave her Schedule A, which she used to make pension contribution payments for nearly two years. The record contains an email from Joyce Sanders confirming that "a new contract was agreed upon effective 12/1/14 . . . this resulted in five days using the old rate and two days using the new rate." The testimony of

---

[9] Joyce Sanders also worked as the treasurer and secretary for Delta.

Robert Sanders, Jr. also confirms that a new agreement was reached between Sanders and Santana in 2014.[10]

As a means of explaining its nearly two years of voluntarily paying pension contributions according to Schedule A, Delta argues that it mistakenly believed that the payments were required by the Rehabilitation Plan.[11]  Delta also points out that Sanders did not sign or initial Schedule A itself—only Santana initialed it.  Moreover, Schedule A lacks page numbers, while the 2008 Schedule A is correctly numbered.  But beyond pointing out minor flaws in the documentation stemming from the informal dealings between Delta and the Union,[12] Delta provides little evidence contradicting the Board's finding that Schedule A was incorporated into the CBA in December 2014.  At most, it offers Robert Sanders Jr.'s conclusory statement, based not on his personal knowledge of the negotiations but on his

---

[10] Because Sanders died in May 2016, his son, Robert Sanders, Jr., who also worked for Delta, testified before the ALJ.

[11] While it is outside the scope of our disposition of this case, we disagree that this belief was mistaken.  *See* 29 U.S.C. §§ 1085(e)(3)(C)(i), (ii) (requiring pension funds to impose rehabilitation plan payment schedules where the employer and union do not adopt them voluntarily).  Moreover, Delta does not explain why its mistaken belief did not also lead Sanders to sign Schedule A.  Delta's argument that Sanders mistakenly believed that he was obligated to pay the Rehabilitation Plan's scheduled rates supports the Board's finding that Sanders agreed to those same rates in December 2014 as part of Schedule A.

[12] Delta's proffered version of the CBA suffers from similar defects.  For example, the 2008 Schedule A lacks a dated signature, and by its own terms only applies to the years 2007 and 2008.  Moreover, Sanders Jr. testified that the 2008 Schedule A originated from previous collective bargaining agreements with the Union and was not physically included in the CBA.

review of the file, that the 2008 Schedule A still governed the relationship between Delta and the Union.[13]

We recognize that the ALJ found that the CBA's Article 18.1 "provides for a base rate of $1.95 per hour."[14] In our view, the Board's finding that Schedule A was incorporated into the CBA, made as part of a decision affirming the ALJ, does not contradict the ALJ's finding regarding the base rate that the Parties agree applied in 2008. Whatever their current disputes, the parties agree that the $1.95 rate applied in 2008, so the ALJ's finding is unsurprising. And because the ALJ expressly decided not to consider the merits of Delta's Section 302 defense, it had no occasion to make findings concerning Schedule A's incorporation into the CBA. Since Schedule A was immaterial to the ALJ's ruling that Delta committed an unfair labor practice, the ALJ did not accept or reject the argument that Schedule A was incorporated into the CBA in 2014, and did not make any credibility findings as to the testimony on that point.[15] Moreover, the ALJ included in

---

[13] We note that Delta's version of events does not account for the automatic surcharge payments, calculated as a percentage of its monthly pension contributions, that it concedes that the PPA would have mandated that it pay to the Pension Fund if, as it argues, it never agreed to pay heightened pension contribution rates. *See* 29 U.S.C. § 1085(e)(7).

[14] Article 18.1 of the CBA does not specify a pension contribution rate. Instead, it refers to a "Wage Schedule 'A.'" While the ALJ does not explain this finding, we assume, for the sake of argument, that the ALJ gleaned the $1.95 rate from the 2008 Schedule A.

[15] While the ALJ explicitly discredited a portion of Santana's testimony concerning the negotiation of a different agreement not at issue on appeal, the ALJ did not discredit Santana's testimony regarding Schedule A.

her factual findings portions of Santana's account of the CBA negotiation that occurred in December 2014, including Santana's testimony that Sanders agreed to raise wages to match the then-current BAE contract, from which Schedule A was copied. We thus see no contradiction.

Even assuming *arguendo* that the Board contradicted the ALJ on this point, we would still uphold the Board's finding. We recognize that "[o]ur [substantial evidence standard] is more 'searching' in instances where the Board's findings or conclusions are contrary to those of the ALJ." *Plaza Auto Ctr., Inc. v. NLRB*, 664 F.3d 286, 291 (9th Cir. 2011) (quoting *United Steel Workers of Am. AFL-CIO-CSC v. NLRB*, 482 F.3d 1112, 1117 (9th Cir. 2007)). But even under this more searching form of review, we still ultimately apply the substantial evidence standard when reviewing the Board's factual findings. *See Penasquitos Vill.*, 565 F.2d at 1076 (citing *Universal Camera*, 340 U.S. at 496). We review most critically the Board's rejection of the ALJ's credibility findings or factual findings that rely upon live testimony. *Id.* at 1078–80. In contrast to these testimonial inferences, "a Court of Appeals must abide by the Board's derivative inferences, if drawn from not discredited testimony, unless those inferences are 'irrational,' 'tenuous' or 'unwarranted.'" *Id.* at 1079 (citations omitted)).

Here, the ALJ's finding that $1.95 was the contractual base pension contribution rate was not itself a credibility finding, and it is not clear what the ALJ relied upon in reaching that conclusion. Moreover, because the ALJ deferred deciding whether Delta's payment of heightened rates would violate Section 302, the ALJ did not even mention, let alone make any findings concerning, Schedule A's incorporation into the CBA.

Meanwhile, the Board, after affirming with modifications the ALJ's findings and ruling, concluded that Schedule A was incorporated into the CBA.  In doing so, the Board referred to the testimony of Santana and Joyce Sanders, Delta's own payment history, and Joyce Sanders's email to the Pension Fund explaining the payment decrease in March 2016.  Beyond that evidence, we note Joyce Sanders's email and Robert Sanders, Jr.'s testimony, which both recognize that Delta and the Union reached a new agreement in 2014.  In addition, Delta cannot point to any support in the record, beyond the equivocal testimony of Robert Sanders, Jr., that the $1.95 rate, which was originally negotiated in 2007 or earlier, still applies.  Overall, we conclude that, even when considered under a more critical eye, the Board's finding that Schedule A was incorporated into the CBA in December 2014 was supported by substantial evidence.[16]

## II.  The Board's conclusion that Section 302 was satisfied by the CBA

While we defer to the Board's interpretation of the NLRA as long as it is reasonably defensible, *see United Nurses*, 871 F.3d at 777, we review de novo the Board's interpretations of statutes other than the NLRA, *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 144 (2002),

---

[16] Our colleague in dissent argues that the Board did not sufficiently justify its finding that Schedule A was incorporated into the CBA.  We disagree—as described above, the Board's ruling made amply clear the basis for its finding.  Among other things, the Board was convinced (as are we) by the undisputed testimony of Delta's secretary and treasurer Joyce Sanders, who stated that Sanders provided her with Schedule A and that she used it to pay pension contributions for nearly two years.

such as the LMRA.**[17]** Thus, we review de novo the Board's conclusion that the CBA satisfied Section 302.

We affirm the Board's conclusion that the CBA, which incorporated Schedule A, met Section 302's requirements. The LMRA prohibits payments by employers to unions. 29 U.S.C. § 186(a). However, that general prohibition is subject to several exceptions, including for pension contributions to a trust fund where, in pertinent part, "the detailed basis on which such payments are to be made is specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5)(B). Section 302's requirement is designed to protect employees' pensions by preventing the misuse of pension funds by union officials and employers: "The reason for the rigid structure of Section 302 is to insure that employer contributions are only for a proper purpose and to insure that the benefits from the established fund reach only the proper parties." *Guthart v. White*, 263 F.3d 1099, 1102 (9th Cir. 2001) (quoting *Thurber v. W. Conf. of Teamsters Pension Plan*, 542 F.2d 1106, 1108 (9th Cir. 1976)). In *Guthart*, we recognized that a variety of written agreements other than collective bargaining agreements, including pre-hire agreements and the pension fund's trust agreement, can satisfy Section 302. *Guthart*, 263 F.3d at 1103–04; *see also Hinson v. NLRB*, 428 F.2d 133, 139 (8th Cir. 1970) (Section 302 "does not comprehend solely a collective bargaining agreement to the exclusion of any other possible written agreement.").

---

**[17]** The Board can consider a Section 302 defense to a charge of an unfair labor practice, even though the Board is not empowered to administer the LMRA. *See BASF Wyandotte Corp.*, 274 N.L.R.B. 978, 979 (1985), *enforced*, 798 F.2d 849 (5th Cir. 1986).

Additional court and agency authorities recognize that Section 302 can be satisfied by many different forms of written agreements. *See Bricklayers Local 21 of Ill. Apprenticeship and Training Program v. Banner Restoration, Inc*., 385 F.3d 761, 770 (7th Cir. 2004) (noting that pension contribution obligations have been "enforced in a variety of circumstances, absent a signature to a current collective bargaining agreement"); *Concord Metal, Inc*., 298 N.L.R.B. 1096, 1096 (1990) ("[T]he Board has consistently held that an expired contract, under which the obligation to make payments to the fringe benefit funds arose, is sufficient to meet the 'written agreement' requirement of [Section 302]."); *Carpenters' Dist. Council of St. Louis*, 276 N.L.R.B. 682, 692 (1985) (finding that a collective bargaining agreement that referenced a trust agreement detailing how payments were to be made satisfied the LMRA); *Richmond Homes, Inc.*, 245 N.L.R.B. 1205, 1213 (1979) (stating that a "trust fund agreement separate and apart from the collective-bargaining agreement would surely satisfy the statutory prerequisite," and that multiple documents can be read together to meet the requirements of the LMRA (quoting *Hinson*, 428 F.2d at 139)).

Here, we need not look beyond the CBA; the parties agree that Article 18.1 of the CBA obligates Delta to make pension contributions to the Pension Fund, and the Board found, based on substantial evidence, that the CBA incorporated the rates in Schedule A. We agree with the Board that the requirements of Section 302 were met by the CBA.

The cases that Delta relies upon to argue that Section 302 was violated illustrate the CBA's sufficiency here. We have held that Section 302 was violated when an employer made pension contributions on behalf of employees not included

within the scope of the applicable collective bargaining agreement or any other written agreement. *See Guthart*, 263 F.3d at 1103–05 (holding that payment of benefits to nonunion employee not covered by the collective bargaining agreement or trust agreement violated Section 302); *Thurber*, 542 F.2d at 1109 (holding that a pension contribution to cure a lapse in employment, where it contravened the terms of the collective bargaining agreement, was a violation of Section 302). But here, the Parties do not dispute that the CBA called for pension contributions and covered Delta's employees.

Other cases that Delta relies upon involve a complete absence of any written agreement between the employer and a union—a point not at issue here, because, as the Parties concede, the CBA, whose terms still bind the Delta and the Union, clearly obligates Delta to make pension contributions on behalf of its employees. *See Moglia v. Geoghegan*, 403 F.2d 110, 117–18 (2d Cir. 1968) (holding that Section 302 was violated where "[a]ppellant conceded . . . that at no time relevant . . . there was a collective bargaining agreement or any written agreement" between the employer and the union); *R.V. Cloud Co., Inc. v. W. Conf. of Teamsters Pension Trust Fund*, 566 F. Supp. 1426, 1428–29 (N.D. Cal. 1983) (same); *Carter v. CMTA-Molders & Allied Workers Health & Welfare Tr.*, 563 F. Supp. 244, 247–48 (N.D. Cal. 1983) (holding that Section 302 was violated where there was no written agreement and the pension contributions were implied solely from the parties course of dealing). Even Delta does not argue that it is not obligated to make *any* pension contributions.

In *Maxwell v. Lucky Constr. Co.*, 710 F.2d 1395, 1398 (9th Cir. 1983) and *Waggoner v. Dallaire*, 649 F.2d 1362, 1366 (9th Cir. 1981) we ruled that Section 302 cannot be

satisfied by an oral modification of a written agreement, a circumstance also not at issue here. *See also Pierce Cty. Hotel Emps. and Rest. Emps. Health Tr. v. Elks Lodge, B.P.O.E. No. 1450*, 827 F.2d 1324, 1328 (9th Cir. 1987) (Section 302 prohibits oral modifications of prior written agreement establishing benefit contributions); *Nw. Adm'rs, Inc. v. B.V. & B.R., Inc.*, 813 F.2d 223, 226–27 (9th Cir. 1987) (oral or tacit agreements are not considered when interpreting the meaning of a pension contribution agreement); *Kemmis v. McGoldrick*, 706 F.2d 993, 996–97 (9th Cir. 1983) (district court erred in using oral understandings to interpret benefit provisions in labor contract); *San Pedro Fishermen's Welfare Tr. Fund Local 33 v. Di Bernardo*, 664 F.2d 1344, 1345 (9th Cir. 1982) (oral modifications and strike settlement agreement did not modify trust fund agreement). Joyce Sanders, the Delta employee in charge of making pension contributions, admitted that she paid the controverted contributions in accordance with the written Schedule A, which Delta itself produced.

Notably, many of the cases that Delta relies upon directly contradict its inflexible reading of Section 302's requirements. *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1263–64 (9th Cir. 1984) (payments did not violate Section 302 where collective bargaining agreement did not "explicit[ly] incorporat[e]" trust agreements containing pension contribution obligations, but employer's record of pension contributions demonstrated the intent of the parties to be bound by trust agreements); *Alvares v. Erickson*, 514 F.2d 156, 161 (9th Cir. 1975) (construing collective bargaining agreement and referenced trust agreement as one "contract" for purposes of LMRA); *Hinson*, 428 F.2d at 139 (holding that Section 302 "does not comprehend solely a collective bargaining agreement to the

exclusion of any other possible written agreement"); *Made 4 Film, Inc.*, 337 N.L.R.B. 1152, 1152 n.2 (2002) (rejecting argument that pension contributions made pursuant to an expired collective bargaining agreement violated Section 302). Even under Delta's rigid view of Section 302's requirements, however, the written CBA at issue here, which the Board correctly found incorporated the written Schedule A, would pass muster.

*Bricklayers, Masons and Plasterers International Union of America, Local Union No. 15, Orlando, Florida v. Stuart Plastering Co., Inc.* (*"Bricklayers"*), 512 F.2d 1017 (5th Cir. 1975), another case cited by Delta, demonstrates the awkwardness of Delta's Section 302 defense under these circumstances. In *Bricklayers*, the court ruled that, because the applicable collective bargaining agreement required the employer to make pension contributions, along with other fringe benefits, to an unspecified "health and welfare fund," the agreement violated the LMRA. *Id.* at 1026, 1029. While the collective bargaining agreement contained a payment schedule, the court emphasized that the union had not set up any kind of fund to receive pension benefits, and that union officials had skimmed benefit contributions for their own personal use. *Id.* at 1027–28, 1027 n.14. Importantly, the court interpreted Section 302's "written agreement" requirement as primarily concerned with the trust fund's structure and documentation, rather than the amount of payments to the trust fund: "[A]lthough the *amount* of required payments may form the focus of a union's interest in fringe benefit funds, that limited perspective does not epitomize the congressional concern that led to the enactment of Section 302." *Id.* at 1027 (emphasis added). Rather, Section 302 was intended to prevent the "loose management of fringe benefit funds," *id.* at 1028, and to "guarantee that payments made by employers were used to

provide employees with the benefits to which they were entitled under a collective bargaining agreement," *id.* at 1025.

Here, the purpose, destination, and mandatory nature of the pension contributions are not at issue.  The CBA specifically designates the Pension Fund to receive Delta's pension contributions, and there is no dispute concerning the Pension Fund's structure, management, or conformity with 29 U.S.C. § 186(c)(5).  Instead, Delta argues that Section 302 shields it from paying into a duly constituted Pension Fund the amounts that Delta itself once recognized, and that we agree, were "mandatory".  We agree with the Board's rejection of Delta's Section 302 defense and hold that the CBA meets Section 302's "written agreement" requirement.[18]

## III.    The Board's conclusion that Delta committed an unfair labor practice

We affirm the Board's finding that Delta committed an unfair labor practice.  Section 8(a)(5) makes it unlawful "for an employer . . . to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). A violation of Section 8(a)(5) produces a derivative violation of Section 8(a)(1).  *Local Joint Exec. Bd. of Las Vegas v. NLRB*, 540 F.3d 1072, 1078 n.8 (9th Cir. 2008).

When a collective bargaining agreement expires, its terms remain in effect by operation of law, defining the status quo as to wages and working conditions.  *Litton*,

---

[18] Because we affirm the Board based on our conclusion that the CBA satisfies Section 302, we do not decide today whether the Rehabilitation Plan, on its own, would have satisfied Section 302.

501 U.S. at 198; *NLRB v. Carilli*, 648 F.2d 1206, 1214 (9th Cir. 1981); *see also Triple A Fire Prot., Inc.*, 315 N.L.R.B. 409, 414 (1994).  An employer must maintain the status quo until it agrees on a new contract with the Union or the bargaining parties reach a good-faith impasse.  *Litton*, 501 U.S. at 198.  "Because contributions to an employee pension trust fund constitute a mandatory bargaining subject, an employer may not make unilateral changes in pension fund contributions."  *Am. Distrib. Co. v. NLRB*, 715 F.2d 446, 449 (9th Cir. 1983); *see also Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 779 F.2d 497, 500 (9th Cir. 1985).

Here, it is undisputed that, as of the expiration of the CBA and pursuant to Schedule A, Delta made monthly pension contributions at a rate of $9.78.  In March 2016, without previous notice or bargaining, Delta decreased its pension contribution rate to $1.95.  Delta clearly committed an unlawful labor practice when it lowered its pension contributions without notifying or bargaining with the Union.

## CONCLUSION

The Board's rejection of Delta's claim that Section 302 prevents it from making pension contributions according to Schedule A was sound as a matter of law and supported by substantial evidence in the record.  Likewise, its conclusion that Delta's failure to notify or bargain with the Union before decreasing its pension contribution was an unfair labor practice was correct.  Accordingly, we **DENY** Delta's petition for review and **GRANT** the Board's application for enforcement.

**PETITION DENIED, APPLICATION GRANTED.**

BUMATAY, Circuit Judge, dissenting:

Contrary to the findings of the administrative law judge, the National Labor Relations Board found an *undated*, *unsigned*, *standalone* document with contested origins enforceable against Delta Sandblasting Company, Inc. in a labor dispute with its union. Given its suspect provenance and the lack of *any* traditional indicia of contract formation here, the Board's conclusion is questionable to say the least. Yet, the Board's decision is ultimately entitled to deference, *see* 29 U.S.C. § 160(e), and I respect its ability to make this determination. I nonetheless dissent because, as our precedent shows, the Board owes a reasoned explanation for its departure from the ALJ's findings and it fell far short of that here.

**I.**

We uphold the Board's orders only if it "correctly applied the law and its factual findings are supported by substantial evidence." *Glendale Assocs., Ltd. v. NLRB*¸ 347 F.3d 1145, 1151 (9th Cir. 2003). "Substantial evidence is more than a mere scintilla, but less than a preponderance." *NLRB v. Int'l Bhd. of Elec. Workers, Local 48, AFL CIO*, 345 F.3d 1049, 1053–54 (9th Cir. 2003) (simplified).

"Our review is more searching in instances where the Board's findings or conclusions are contrary to those of the ALJ." *Plaza Auto Ctr., Inc. v. NLRB,* 664 F.3d 286, 291 (9th Cir. 2011); *see also Penasquitos Vill., Inc. v. NLRB,* 565 F.2d 1074, 1078 (9th Cir. 1977) ("[E]ven when the record contains independent, credited evidence supportive of the Board's decision, a reviewing court will review more critically the Board's findings of fact if they are contrary to the administrative law judge's factual conclusions."). This is because "when taken alone," evidence may be "substantial" and, therefore, support the Board's decision,

but it is often insufficient when "the trial examiner has, on the basis of the witnesses' demeanor, made credibility determinations contrary to the Board's position." *Penasquitos Vill.,* 565 F.2d at 1078. Accordingly, the Board's findings may not be supported by "substantial evidence" when "an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's." *Plaza Auto Ctr.*, 664 F.3d at 291 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951)).

When the Board has disagreed with the ALJ's conclusions or findings, we have remanded to the Board to provide "a reasoned explanation" for its rejection of the ALJ's credibility and factual findings. *Plaza Auto Ctr.,* 664 F.3d at 295; *see also Traction Wholesale Ctr. Co. v. NLRB,* 216 F.3d 92, 101 (D.C. Cir. 2000) ("Of course, the Board is free to substitute its judgment for the ALJ's, but when the Board reverses an ALJ it must make clear the basis of its disagreement.") (simplified); *cf. Maka v. INS*, 904 F.2d 1351, 1355 (9th Cir. 1990) ("When the [agency] rejects the credibility findings of the ALJ, it must state its reasons for doing so, and the reasons must be based on substantial evidence.") (simplified). Without this explanation, we are left with large gaps in the Board's reasoning and cannot satisfy our duty to ensure "substantial evidence" supports its conclusions in light of the whole record.

## II.

Delta is a small, family-run business with between 6 and 15 employees. It performs marine sandblasting and painting services in the San Francisco Bay Area. Its past president and owner was James "Bobby" Sanders, Sr., and its treasurer and secretary was his wife, Joyce Sanders. When Bobby Sr. passed away in May 2016, his son, Bob Sanders, Jr., took

over as president of the company. Delta's workers are represented by Auto, Marine & Specialty Painters Local 1176 (the "Union") with José Santana as one of its directors. Beginning in 2008, Delta and the Union entered a collective bargaining agreement (or "CBA") setting the terms of wages, pensions, health benefits and other conditions. The agreement expired on August 31, 2015.

Delta and the Union agree on several aspects of the agreement. First, both understand that Delta is obligated to contribute to the Union's pension fund under the agreement. Next, both concur that that pension rate is governed by a "Wage Schedule 'A'" incorporated into the agreement. Finally, they both agree that, in December 2014, they renegotiated certain terms of the agreement to cover the period between December 1, 2014 and August 31, 2015.

Disagreements begin from here. On one side, Delta argues that the December 2014 agreement altered only wage rates, not pension rates, so its pension contribution remained set by the original 2008 Schedule A (the "2008 Schedule A"). This 2008 Schedule A calls for a pension rate of $1.95 per hour. On the other hand, the Union contends that Delta agreed to a new pension rate, incorporated through a new Schedule A (the "2014 Schedule A"), which set pension rates at $8.18 for 2014 and $9.78 for 2015.

The question of whether the 2014 Schedule A was incorporated into the CBA is central to this case. Under the Board's rationale, the answer determines whether Delta engaged in unfair labor practices by reducing its pension contribution to $1.95 in March 2016. If the parties never agreed to the 2014 Schedule A, then requiring Delta to pay the increased pension rates might violate § 302 of the Labor Management Relations Act. Under that law, employer contributions to a labor organization are forbidden unless a

written agreement specifies the basis on which the payments are made. 29 U.S.C. § 186(c)(5)(B). Accordingly, the Schedule A's incorporation is a necessary predicate for Delta owing the Union the higher pension rates.

## A.

The battle of the Schedule As was front and center before the ALJ. At the outset, Santana's testimony was used to introduce and validate the 2014 Schedule A as part of the overall contract. But Delta immediately challenged the document's authenticity and incorporation into the CBA.[1] In response, the ALJ explicitly recognized that the incorporation of the 2014 Schedule A was squarely "an issue of credibility" and she would "figure . . . out" the "question of competing documents."

The ALJ heard testimony from Santana, who explained that he created the 2014 Schedule A and, although Sanders Sr. did not sign or initial the document, he agreed to it at a December 2014 meeting. The ALJ also presided over the testimonies of Sanders Jr., who directly denied the new Schedule A's incorporation, and Ms. Sanders, who explained she had received the new Schedule A from her husband, but it was not attached to the renegotiated CBA.

In the end, the ALJ rejected the Union's contention that the 2014 Schedule A's increased pension rates were incorporated into the CBA. In her detailed findings of fact, the ALJ observed that Delta was obligated to contribute to the pension fund "[p]ursuant to the Expired Contract," and

---

[1] After Delta's objection, the General Counsel of the Board admitted that the Schedule A was produced separately from the overall contract but sought to admit them together as one.

held "[s]pecifically, the agreement [. . .] provides for a base contribution rate of $1.95 per hour"—the contribution rate of the original 2008 Schedule A. Accordingly, the ALJ unambiguously found that the 2014 Schedule A was neither incorporated into the CBA nor binding on Delta. Otherwise, the ALJ would have necessarily concluded that the base pension rates were $8.18 in 2014 and $9.78 in 2015—not $1.95. So true to her word, the ALJ resolved the "question of the competing documents."[2]

The ALJ expressly noted that the above findings incorporated her credibility determinations. Although not explicitly discrediting Santana's version of events, the ALJ ignored his claim that Sanders Sr. agreed to the 2014 Schedule A. In fact, the ALJ's opinion doesn't mention the 2014 Schedule A *at all*. If the ALJ found Santana believable on this front, then the higher pension rate would have necessarily been mandated by the new agreement. Notably, the ALJ expressly discredited Santana's testimony regarding a subsequent contract negotiation with Delta that occurred only two months after the December 2014 meeting.

On appeal, the Board reversed the ALJ's finding and concluded that the 2014 Schedule A's rates were in fact "incorporated into the 2008–2015 CBA." *Delta Sandblasting Co., Inc.*, 367 N.L.R.B. No. 17, slip op. at 2 (2018). The Board devoted only a single footnote to explain this finding. *Id*. at n.6. The Board relied on Santana's

---

[2] The ALJ ultimately found on behalf of the Union, explaining that, regardless of the CBA's obligations, Delta was still required to pay the higher pension rates because of a mandatory rehabilitation plan adopted by the pension to alleviate its critical underfunded status. The Board disagreed with this rationale. Accordingly, I do not address the ALJ's legal conclusion here—only its factual finding that the 2014 Schedule A was not incorporated into the CBA.

testimony that he "inserted" the 2014 Schedule A into the contract, and that Sanders Sr. executed it afterwards. The Board also relied on Ms. Sanders testimony that she was "familiar" with the 2014 Schedule A and identified it as a "rate sheet," which contained the amounts that Delta was required to pay. *Id.* The Board acknowledged the unusual circumstance that the rate sheet was unattached to the CBA and that Sanders Sr. "simply handed" it to Ms. Sanders, but believed that her "identification of [the 2014] Schedule A as . . . containing the pension contribution . . . paid by [Delta] bolster[ed] the conclusion that . . . [Delta] treated [it] as part of its collective-bargaining agreement with the Union." *Id.* Instead of raising a red flag, the Board found that the 2014 Schedule A's storage as a "stand-alone document" supported Santana's contention that it was a "rate sheet that *could* be inserted into the contract." *Id.* (emphasis added).**[3]**

The Board's footnote didn't acknowledge that it was rejecting the ALJ's conclusion regarding the base pension rate. Making matters more perplexing, the Board apparently didn't even realize it was reversing the ALJ's conclusion. Instead, it inexplicably claimed it was "affirm[ing] the [ALJ's] finding" on the incorporation of the 2014 Schedule A's pension rates. *Id.* This could not be so since the ALJ didn't even mention the 2014 Schedule A in her ruling.

As the majority acknowledges, by its own established policy, the Board should not overrule an ALJ's credibility

---

**[3]** It is odd that the Board predicated its finding of incorporation on the underwhelming testimony that the document "could" be inserted into the contract. Nor does it address the obvious contradiction in its findings between Santana saying that he "inserted" the 2014 Schedule A into the contract and his belief that it merely "could be inserted." The Board also didn't explain why it chose to credit Santana, when the ALJ explicitly discredited him in other aspects of his testimony.

findings unless the "clear preponderance of all the relevant evidence" convinces the Board that the ALJ was incorrect. *Anja Engineering Corp. v. NLRB*, 685 F.2d 292, 295 n.8 (9th Cir. 1982); *cf. Andrzejewski v. FAA*, 563 F.3d 796, 799 (9th Cir. 2009) ("Where an ALJ chooses to credit one set of witnesses' version of events over another, he has made an implicit credibility determination to which the NTSB must defer 'in the absence of any arbitrariness, capriciousness or other compelling reasons.'"). Here, the Board overturned the ALJ's express finding that the agreement's base pension rate was $1.95. And it did so without even acknowledging the ALJ's finding, let alone explaining how the "clear preponderance" of *all* the evidence shows the ALJ was wrong. Accordingly, in rejecting the ALJ's finding without explanation, the Board violated its own policy. This alone warrants a remand.

While I'm ultimately agnostic as to whether Delta agreed to the 2014 Schedule A, the Board's footnote explanation falls far short of the "reasoned explanation" expected here. *See Plaza Auto Ctr.,* 664 F.3d at 295. Accordingly, I would grant the petition and remand to the Board to reassess its conclusion in light of the ALJ's express finding regarding the base pension rate of the CBA.

## B.

Perhaps acknowledging the weaknesses of the Board's justification, the majority bolsters the case with additional facts and inferences not relied on by the Board itself. *See, e.g.*, Maj. Op. at 12–13 (relying on (1) Santana's second-hand account of Sanders Sr.'s instructions to him regarding the 2014 Schedule A; (2) an ambiguous email from Ms. Sanders referring to a "new contract" with a "new rate"

as of December 1, 2014;[4] and (3) testimony from Sanders Jr. that a new agreement was reached in 2014). Much of this evidence is unexceptional as it is uncontested that Delta and the Union entered into a renewed contract beginning on December 1, 2014; the point of contention here is whether new pension rates were made part of that agreement.

More importantly, however, it was the *Board's* duty, not ours, to scour the record and apportion probative weight to the competing evidence. *NLRB v. Reeves Rubber Co.*, 153 F.2d 340, 342 (9th Cir. 1946) ("[The] Board tries the facts and the reviewing court goes into facts only to find whether or not, as a matter of law, there is substance to the evidence upon which the Board has made its findings."). Yet, the majority does so anyway, retrying the case by balancing the evidence at hand. But in doing so, it dismisses inconvenient facts as "minor flaws," such as Santana's inexplicable claim that Sanders Sr. asked Santana to initial the new Schedule A, but failed to do so himself. Maj. Op. at 13. And it overlooks odd explanations such as Santana's assertion that he created the new contract with the 2014 Schedule A, but that his assistant forgot to put a page number on the new document and that he doesn't know why it wasn't

---

[4] I find the majority's reliance on this evidence particularly perplexing. If the majority speculates that the email's reference to a "new rate" shows that Delta agreed to pay an increased pension rate on December 1, 2014, that would make no sense. Delta had been paying the same Schedule A pension rate of $8.18 since April 2014—over eight months at the time. Accordingly, there was no pension rate change on December 1, 2014, regardless of whether the new Schedule A was incorporated. On the other hand, if Delta's version of events was true— that Sanders Sr. agreed to a new wage rate at the December 2014 meeting, then this email could just as easily be referring to a new *wage* rate, which would bolster Delta's position, not the Union's. But our speculations are no substitute for the Board's consideration of this evidence in the first instance.

included with the signed version of the CBA sent to Delta. The majority also doesn't acknowledge Santana's admission that the "only real issue" in the December 2014 agreement is "wages"—not pension rates. Moreover, while the majority readily accepts the testimony of Santana, whom the ALJ explicitly discredited in other aspects of his testimony, it completely discounts Sander Jr.'s emphatic testimony that the new pension rates were not part of the December 2014 deal. Maj. Op. at 16.

To be clear, my concern with the majority's approach does not stem from disagreements with the inferences it draws. For example, I agree that Sanders Sr. had every reason to sign onto the new Schedule A since Delta was already paying the increased pension rates under the (allegedly mistaken) belief it was mandated by the pension fund's rehabilitation plan. Maj. Op. at 13 n.11. But, "[u]nless a trier of fact does the balancing, courts on appeal can only speculate." *Deutscher v. Whitley*, 991 F.2d 605, 607 (9th Cir. 1993), *superseded on reh'g sub nom. Deutscher v. Angelone*, 16 F.3d 981 (9th Cir. 1994).

I point to the flaws in the evidence here only to demonstrate that we, as appellate reviewers, shouldn't engage in this type of evidentiary balancing in the first instance. Regardless of our own views of the evidence, the Board's decision should stand on its own. Instead, the majority's defense of the Board's decision violates the "well-established [rule] that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *United Steel Workers of Am. AFL-CIO-CLC v. NLRB*, 482 F.3d 1112, 1116 (9th Cir. 2007) (simplified). While the majority certainly makes a stronger case than the Board, that is not our role. We should have remanded to require the Board to better explain its conclusions.

\* \* \*

The Board failed to adequately address its rejection of the ALJ's findings here. By not doing so, it violated its own policy. Given these serious problems, our court should not be giving our imprimatur to the Board's decision. For this reason, I respectfully dissent.