NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

APR 21 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS,<br><br>   Petitioner,<br><br> v.<br><br>NATIONAL LABOR RELATIONS BOARD,<br><br>   Respondent. | No. 23-2081<br><br>NLRB Nos.<br>28-CA-230115<br>28-CA-235666<br>28-CA-249413<br>31-CA-237882<br>31-CA-237894<br>31-CA-238094<br>31-CA-238239<br>31-CA-238240<br>28-RC-232059<br><br>MEMORANDUM* |
| CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC,<br><br>   Petitioner,<br><br> v.<br><br>NATIONAL LABOR RELATIONS BOARD,<br><br>   Respondent,<br><br>-------------------------------------- | No. 23-2302<br><br> NLRB Nos.<br>28–CA–235666<br>28–CA–249413<br>31–CA–237882<br>31–CA–237894<br>31–CA–238094<br>31–CA–238239<br>31–CA–238240<br>28–RC– 232059 |

   *    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,

        Intervenor.

---

NATIONAL LABOR RELATIONS
BOARD,

        Petitioner,

  v.

CEMEX CONSTRUCTION MATERIALS
PACIFIC, LLC,

        Respondent,

---------------------------------------

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,

        Intervenor.

No. 23-2377

NLRB Nos.
28-CA-235666
28-CA-249413
31-CA-237882
31-CA-237894
31-CA-238094
31-CA-238239
31-CA-238240
28-RC-232059

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted October 21, 2024
San Francisco, California
Submission Withdrawn October 28, 2024
Resubmitted April 21, 2026

Before: CLIFTON, SUNG, and SANCHEZ, Circuit Judges.
Dissent by Judge CLIFTON.

Cemex Construction Materials Pacific, LLC ("Cemex") petitions for review

of the National Labor Relations Board's ("NLRB's") Decision & Order, and the

Board cross-petitions for enforcement, supported by Intervenor International

Brotherhood of Teamsters ("Union"). We held this case in abeyance pending *International Union of Operating Engineers, Stationary Engineers, Local 39 v. NLRB*, 155 F.4th 1023, 1046, 1048-49 (9th Cir. 2025) ("*Macy's*"). On November 19, 2025, the Board filed a motion to resume proceedings, raising concerns about undue delay. Dkt. 106. The Union joined this motion. Dkt. 110. We agree further delay is unnecessary and grant the motion. We have jurisdiction pursuant to 29 U.S.C. § 160(e). We deny Cemex's petition for review, and we grant the Board's cross-petition for enforcement.

**1. ALJ Constitutionality**

Cemex argues that the removal protections for ALJs of the NLRB are unconstitutional. We need not decide this issue. Even assuming the removal protections are unconstitutional, Cemex's failure to show how the removal protections actually caused Cemex compensable harm "precludes retrospective relief." *NLRB v. N. Mountain Foothills*, 157 F.4th 1089, 1097-98 (9th Cir. 2025) ("[R]etrospective relief based on an unconstitutional removal provision is available only where the provision 'inflict[s] compensable harm.'" (quoting *Collins v. Yellen*, 594 U.S. 220, 259 (2021))).

**2. Unfair Labor Practice ("ULP") Findings Challenged by Cemex**

The Board found that Cemex committed numerous ULPs in violation of 29 U.S.C. § 158(a)(1) (prohibiting employer from "interfer[ing] with, restrain[ing], or

coerc[ing] employees" in the exercise of their rights under NLRA § 7), and § 158(a)(3) (prohibiting employer from "encourag[ing] or discourag[ing] membership in any labor organization" "by discrimination in regard to hire or tenure of employment or any term or condition of employment").[1] "A court must uphold a Board decision when substantial evidence supports its findings of fact and when the agency applies the law correctly." *United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 777 (9th Cir. 2017) (citation and quotation marks omitted). The Board's credibility findings "are entitled to special deference and may only be rejected when a clear preponderance of the evidence" shows that they are "inherently incredible or patently unreasonable." *Delta Sandblasting Co., Inc. v. NLRB*, 969 F.3d 957, 963 (9th Cir. 2020) (quoting *United Nurses*, 871 F.3d at 777).

### A. Dickson's August 2018 Statements

Substantial evidence supports the Board's conclusion that five statements made by foreman Dickson in August 2018 violated § 8(a)(1). *Cemex Constr. Materials Pac., LLC & Int'l Bhd. of Teamsters*, 372 NLRB No. 130, at 3 (Aug. 25, 2023) ("*Cemex*"). Cemex argues only that Dickson did not tell drivers to remove

---

[1] Cemex does not challenge several of the Board's unfair labor practice findings, including the majority of findings regarding § 8(a)(1) violations committed by foreman Dickson in August 2018 and January 2019; and the finding that consultant Santana unlawfully threatened plant closure in January 2019. *Cemex Constr. Materials Pac., LLC & Int'l Bhd. of Teamsters*, 372 NLRB 130, at 11, 16 (2023).

union stickers in August 2018, but Cemex erroneously relies on Dickson's testimony regarding an exchange that occurred in January 2019.

### B. Dickson's January 2019 Statements

Substantial evidence supports the Board's finding that foreman Dickson made four statements in January 2018 that violate § 8(a)(1). *Cemex*, 327 NLRB No. 130, at 4. Cemex argues only that the Board erred in finding that Dickson made two of the four statements, but those findings turned on the Board's credibility determinations. The Board identified specific reasons for crediting the employee's testimony (including that the employee testified against his pecuniary interest) and for finding Dickson lacked credibility (including that Dickson's testimony was inconsistent). *Id.* at 2-4, 65-67. Cemex has not shown by a preponderance of the evidence that those credibility determinations were "inherently incredible or patently unreasonable." *Delta Sandblasting Co.*, 969 F.3d at 963.

### C. Turner's January 2019 Statements

Substantial evidence supports the Board's finding that manager Turner interrogated a driver in violation of § 8(a)(1). *Cemex*, 327 NLRB No. 130, at 4, 69. Cemex argues only that the Board erred in its credibility determination. The Board identified specific reasons for crediting the employee's testimony and finding that Turner lacked credibility, including Cemex's failure to call the plant foreman to

testify. *Id.* at 4, 68-69. Thus, Cemex has not shown by a preponderance of the evidence that the Board's credibility determinations were "inherently incredible or patently unreasonable." *Delta Sandblasting Co.*, 969 F.3d at 963.

### D. January 2019 Surveillance of Employees

Substantial evidence supports the Board's finding that managers Ponce and Nunez violated § 8(a)(1) by surveilling employees and creating an impression of surveillance at the Inglewood plant in January 2019. *Cemex*, 327 NLRB No. 130, at 4. Cemex concedes that Ponce and Nunez engaged in surveillance and created the impression of surveillance. Cemex notes only that the surveillance occurred once, for a maximum of 30 minutes at a single plant, and impacted few employees, and it cites no authority for the proposition that such surveillance does not violate § 8(a)(1).

### E. Forgey's January 2019 Statements

Substantial evidence supports the Board's finding that Vice President Forgey's statements during a January 29, 2019 meeting with drivers violated § 8(a)(1). *Id.* at 4-7.

#### i. Forgey's Statements Regarding Scheduled Wage Increases

The Board found, and Cemex does not dispute, that Forgey told drivers that Cemex traditionally gave employees their annual cost of living increases in the first part of the year, but because of the upcoming union election, Cemex was "in a

status quo position" and Cemex was not "able to give out raises at that point for that reason." *Id.* at 5, 74-76. He also said bargaining could take "years" and Cemex "did not have to agree to anything." *Id.* at 5, 74. The Board concluded that Forgey's statements "constitute[d] an unlawful threat that wage increase would be frozen for possibly years if employees unionized." *Id.* at 5, 76. Cemex concedes Forgey made these statements, and it argues only that the statements merely described the reality of the bargaining process and were therefore lawful.

Substantial evidence supports the Board's interpretation of Forgey's statements as an unlawful threat of loss of benefits (the annual cost of living increases) if the employees voted to unionize. *See W.E. Carlson Corp.*, 346 NLRB 431, 443 (2006) (employer who had a practice of giving annual wage increases violated § 8(a)(1) by telling employees that wages would be frozen during bargaining, which could take years). Even assuming the record also supports Cemex's interpretation, when reviewing for substantial evidence, we may "not 'displace the Board's choice between two fairly conflicting views'" of speech. *United Nurses*, 871 F.3d at 777 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

### ii. Forgey's Statements Regarding Converting Plants

Substantial evidence supports the Board's finding that Forgey's statement that Cemex could legally turn plants into "satellites" violated § 8(a)(1). *Cemex*,

327 NLRB No. 130, at 6, 76. The Board and ALJ agreed that this statement was an unlawful threat, but they disagreed about the specific implications of the threat. *Id.* at 6. The Board found that drivers reasonably understood Forgey's statement as a threat to close individual plants and lay off drivers, while the ALJ found that the satellite statement was a threat to unilaterally transfer work without negotiating with the Union. *Id.* at 6, 76 n.23. Cemex contends the Board's interpretation is unsupported by the record.

Because the Board disagreed with the ALJ's interpretation, we subject the Board's finding to a "more searching form of review." *Delta Sandblasting*, 969 F.3d at 965. "[T]he ALJ's findings become part of the record for review to be weighed against the evidence supporting the agency." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. (UAW) v. NLRB*, 834 F.2d 816, 819 (9th Cir. 1987). Ultimately, however, our court still reviews the Board's findings for substantial evidence. *Delta Sandblasting*, 969 F.3d at 965. Here, driver testimony and Cemex's own description of how Cemex operates "satellites" substantially support the Board's finding that drivers reasonably understood Forgey's statement as a threat of plant closure. *Cemex*, 327 NLRB No. 130, at 6, 76.

### iii. Forgey's Statements Regarding Strikers' Reinstatement

Substantial evidence supports the Board's finding that Forgey's statements

regarding what would occur if employees unionized and participated in a strike violated § 8(a)(1). *Id.* at 5-6. Cemex does not meaningfully dispute the Board's findings regarding the content of Forgey's statements or the legal bases for the Board's conclusions that those statements violated § 8(a)(1).

Regarding the content of the statements, Cemex asserts only that Forgey merely discussed his personal experience related to a strike. The Board acknowledged that Forgey referred to his personal experience, but found that he also linked "what he experienced in the past[] to what Cemex employees would experience if they went on strike[,]" and "[b]y doing so he implied that, regardless of what was occurring at any particular time in the future, and notwithstanding the type of strike, less senior employees who went on strike would have to wait an indefinite period until they could return to work when the strike ended." *Id.* at 5, 76. That finding is supported by the record, including Forgey's own testimony, which shows that he did not limit his statements to his past experience.

Cemex also argues that the Board erred in concluding Forgey's statements violated § 8(a)(1) because Cemex included more accurate statements about the law in other materials, such as a PowerPoint slide and a handout. However, Cemex offers no authority for the proposition that an employer may misstate the law to employees in a manner that violates the Act so long as it gives the employees other materials that describe the law more accurately. Further, as the Board noted,

Cemex's PowerPoint deck includes a slide that also misstates the law regarding the rights of striking employees. *Id.* at 5-6 n.33.

### F. Dissemination of Misstatements About Strikers' Rights

Substantial evidence supports the Board's finding that Cemex violated § 8(a)(1) by widely disseminating Forgey's misstatements about strikers' rights to unit employees. *Id.* at 5 n.33. Cemex argues that there is insufficient evidence to show that Forgey made the same statements at all the meetings at which he spoke. We disagree. The Board's finding of widespread dissemination is supported by the evidence it cited, which includes Cemex's PowerPoint slides, Forgey's testimony that he participated in a "road show" of meetings at which the "content was all the same," and testimony from drivers from different plants. *Id.* at 5-6 n.33.

### G. Faulkner's February 2019 Statements

Substantial evidence supports the Board's finding that Plant Superintendent Faulkner's February 2019 statements were not predictions based on objective fact and therefore violated § 8(a)(1). The Board found that Faulkner told employees he may lose the ability to teach drivers how to work as batchmen or drive a loader or how to "learn and grow" with the company if they unionized, and it concluded those statements were unlawful threats that unionization would limit the driver's work opportunities. *Id.* at 7, 79. An employer may express predictions about the possible effects of unionization, but such predictions must be "carefully phrased on

the basis of objective fact to convey [the] employer's belief as to demonstrably probable consequences beyond his control." *UAW*, 834 F.2d at 820 (quoting *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 618 (1969)).

Cemex argues the objective basis for Faulkner's statement was his "personal experience working in a union environment." However, Faulkner did not couch his statement in terms of his personal experience. Further, the Board found, and Cemex does not meaningfully dispute, that Faulkner's statements were contradicted by record evidence that the Cemex bargaining unit included drivers who drive loaders and work as batchmen. *Cemex*, 327 NLRB No. 130, at 7, 79.

### H. Company Time Rule Promulgation and Dissemination

Cemex first argues that the allegations regarding the promulgation of and enforcement of the "company time" rule are untimely because the General Counsel did not raise them in its complaint within the NLRA's six-month statute of limitations. Cemex misunderstands the relationship between the General Counsel's complaint and the underlying unfair labor practice charge. Under 29 U.S.C. § 160(b), "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." Here, the allegations are timely because the Union filed an unfair labor practice charge alleging Cemex was engaging in a pattern of "discriminating against employees for engaging in pro union activities" within six months of the allegations at issue. The

General Counsel properly "supplemented or amplified" that general allegation with "more specific allegations which 'relate back' to the date the charge was filed." *NLRB v. Carilli*, 648 F.2d 1206, 1210 (9th Cir. 1981).

Turning to the merits, substantial evidence supports the Board's finding that managers Faulkner and Charlson promulgated a rule prohibiting employees from talking to union organizers on "company time" and issuing a "disciplinary verbal warning" to driver Ornelas for talking to organizers on company time, in violation of § 8(a)(1). *Cemex*, 327 NLRB No. 130, at 7-8, 81. Cemex concedes that a rule prohibiting employees from talking to union organizers during "company time" is unlawful, even though a rule prohibiting such activity during "working time" is permitted. Cemex disputes only the Board's factual finding, noting the managers testified they said "working time" instead of "company time." However, the Board discredited the managers' testimony, including because it was inconsistent with their meeting notes and disciplinary chart. *Id.* at 7, 81. Cemex offers no basis for rejecting those credibility determinations.

Substantial evidence also supports the Board's finding that Cemex widely disseminated this rule. The Board relied on (1) Ornelas's credited testimony; (2) manager Charlson's testimony that Faulkner told Ornelas that drivers had been informed of the rule in prior meetings; (3) Faulkner's contemporaneous meeting notes stating that Ornelas had been informed of the "company time" rule during

meetings with consultants; and (4) a disciplinary chart stating Ornelas was informed of the "company time" rule in group meetings. *Id.* at 7-8 n.41, 80-81. Cemex asserts that the Board erred in basing this finding on testimony that the ALJ discredited, presumably referring to the fact that the ALJ discredited Charlson's claim that Faulkner referred to "working time" instead of "company time." The Board did not err in discrediting only part of Charlson's testimony, and, in any event, the part on which the Board relied is corroborated by other evidence.

### I. Turner's February and March 2019 Statements

Substantial evidence supports the Board's finding that manager Turner made statements that violate § 8(a)(1) during individual conversations with three employees between late February and early March 2019. *Id.* at 8. Cemex conclusorily challenges these findings, asserting only that "Turner denied making the unlawful statements in question, and none of them constituted 'hallmark violations.'" The Board credited the employees' testimony over Turner's denials, and Cemex offers no basis for rejecting those credibility determinations. *Id.* at 8, 82-84.

### J. Use of Security Guards

Cemex first argues that the agency violated its due process rights by finding Cemex guilty of an unfair labor practice that was not specifically alleged in the complaint. The complaint alleged that Cemex unlawfully used security guards on

the election day at three polling locations. The ALJ found that Cemex unlawfully used security guards for two weeks before the election at numerous plants, and on election day at all polling locations. *Id.* at 9, 89-92. The agency did not violate due process by finding Cemex used security guards more broadly than alleged in the complaint. "[T]he Board may find and remedy a violation even in the absence of a specified allegation in the complaint if the issue is closely connected to the subject matter of the complaint and has been fully litigated." *Pergament United Sales, Inc.*, 296 NLRB 333, 334 (1989), *enforced sub nom.*, *Pergament United Sales, Inc. v. NLRB*, 920 F.2d 130 (2d Cir. 1990).

### i. Use of Guards Preceding the Election

The Board's finding that Cemex used guards in the two-week period preceding the election is closely connected to the complaint's allegation regarding the use of guards on the date of the election. *Cemex*, 327 NLRB No. 130, at 9; *see also United Nurses*, 871 F.3d at 790 (close connection between ULP finding of written policy and complaint allegation of oral policy); *Hi-Tech Cable Corp.*, 318 NLRB 24, 280 (1995) (close connection between ULP finding of unlawful promise of benefits by one manager and complaint allegation of same violation by a different manager). Moreover, Cemex's own witness, Vice President Forgey, brought up the use of guards before the election in response to a question about the use of guards on election day. The rule that the Board may find an unalleged

violation that is closely connected to a complaint allegation "applie[s] with particular force where the finding of a violation is established by the testimonial admissions of the [employer's] own witness." *Pergament*, 296 NLRB at 334.

The issue of pre-election use of guards was also fully litigated. Cemex had the opportunity to question witnesses and introduce evidence about this issue during the hearings, and it addressed this issue in its post-hearing brief. We also note that the Union's election objections specifically alleged that Cemex used security guards before the election day, and the hearings on the election objections and the unfair labor practice charges were consolidated. *Cemex*, 327 NLRB No. 130, at 56.

### ii. Use of Guards on Election Day

The Board's finding that Cemex used guards on election day at all polling locations is also closely connected to the complaint allegation that Cemex used guards at some locations. *Id.* at 9. The ULP finding and the complaint allegation are based on the same theory of liability. *See NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 349-50 (1938) (rejecting due process challenge where complaint alleged employer failed to rehire but agency found employer wrongfully discharged because the employer had notice of the underlying theory of liability). Further, Cemex did not object to the Union's introduction into evidence of three invoices showing that Cemex hired guards on election day at plants outside those

mentioned in the complaint. *See Pergament*, 296 NLRB at 334-35 (close connection because "no party objected to the introduction of any of the relevant evidence"). This issue was also fully litigated.

Finding no due process violation, we turn to Cemex's challenge to this ULP finding on the merits. Substantial evidence supports the Board's finding that Cemex violated § 8(a)(1) by deploying security guards throughout its plants two weeks preceding the election and on election day. *Cemex*, 327 NLRB No. 130, at 9. Cemex argues that the security presence was lawful because it was justified by legitimate, non-pretextual concerns. However, the ALJ found Forgey's testimony about Cemex's reasons for hiring the guards lacked credibility and was not substantiated by any employee testimony or documentary evidence. *Id.* at 90. Cemex does not challenge that credibility determination. Cemex also argues that the use of security guards was minimal. But substantial evidence supports the Board's findings that guards patrolled facilities, stood at the entrances of every polling location, and prevented employees from entering or remaining at the plant in a manner inconsistent with past practice, and that the nature and magnitude of Cemex's use of guards in the critical period and on election day was extensive and unprecedented. *Id.* at 9, 90.

Cemex also argues this case is meaningfully distinguishable from cases in which the Board has found an employer's use of guards was unlawful. The Board

first contends that Cemex misrepresents the facts, but also argues in the alternative that, even assuming Cemex's assertions about the manner in which the guards were deployed are accurate, the Board correctly applied the rule that the unprecedented and unjustified use of guards violates § 8(a)(1). We agree. *See, e.g.*, *Wismettac Asian Foods, Inc.*, 370 NLRB No. 35, at 51 (Oct. 14, 2020), *affirmed sub nom.*, *Wismettac Asian Foods, Inc. v. NLRB*, 2022 WL 313776, at *2 (9th Cir. Feb. 2, 2022), *cert. denied*, 143 S. Ct. 104 (Oct. 3, 2022) (finding that hiring guards without justification interferes with employees' free choice in voting); *Austal USA, LLC*, 349 NLRB 561, 576 (2007) (finding that the "unprecedented presence of uniformed guards at the plant entrance … interfered with the employees' right to exercise their choice free from intimidation"); *Beverly Cal. Corp. v. NLRB*, 227 F.3d 817, 843 (7th Cir. 2000) (affirming the Board's finding that there was no justification for posting guards at facility entrances and requiring employees to show guards identification to use the entrances); *cf. Quest Int'l*, 338 NLRB 856, 857 (2003) (no violation where guards stood at the perimeter of the polling facility and did not interrogate, surveil, or confront employees).

### K. Driver Ornelas's July 2019 Suspension and September 2019 Termination

The Board found that Cemex suspended and later terminated Ornelas because of her protected activities, on two independent grounds: (1) motive, and (2) progressive discipline based in part on prior unlawful discipline. *Cemex*, 327

NLRB No. 130, at 10, 102-05. For the reasons explained below, each ground relied on by the Board is supported by substantial evidence.

Regarding Cemex's motives for suspending and discharging Ornelas, Cemex contends that the Board erred in finding that Cemex failed to show that it would have taken those disciplinary actions against Ornelas absent her protected activities.[2] "The Board has special expertise in drawing inferences of credibility and unlawful motive, and its determinations are entitled to judicial deference." *Kava Holdings, LLC v. NLRB*, 85 F.4th 479, 486 (9th Cir. 2023) (quotation marks and citation omitted). Here, the Board's findings regarding motive are based on credibility determinations, documentary evidence, and inferences drawn from the totality of the circumstances. *Cemex*, 327 NLRB No. 130, at 10, 96-111. Cemex fails to show that the Board's credibility determinations are "inherently incredible or patently unreasonable," or that the inferences it drew regarding motive are unreasonable. *Delta Sandblasting Co.*, 969 F.3d at 963.

The Board alternatively found that the suspension and discharge each rested on prior unlawful discipline, including a prior unlawful verbal warning issued to Ornelas for her protected union activity. *Cemex*, 327 NLRB No. 130, at 10. Cemex does not dispute the validity of the Board's rule that, "where a respondent

---

[2] Cemex does not dispute the Board's use of "the well-established test set forth in *Wright Line*, 251 NLRB 1083 (1980)," to determine Cemex's motivation for taking the adverse employment actions at issue. *United Nurses*, 871 F.3d at 778.

disciplines an employee based on prior discipline that was unlawful, any further and progressive discipline based in whole or in part thereon must itself be unlawful." *Hays Corp.*, 334 NLRB 48, 50 (2001). Nor does Cemex dispute that Faulkner and Charlson verbally counseled Ornelas for talking with union organizers during downtime. Rather, Cemex argues that this verbal counseling was not a formal disciplinary action. Cemex, however, does not address the Board's specific reasons for rejecting that argument, including Cemex's human resources manager's testimony that there was no difference between a verbal coaching or counseling and a documented verbal warning under Cemex's progressive discipline policy. *Cemex*, 327 NLRB No. 130, at 8.

### 3. The Board's Chosen Remedies

We review the Board's choice of remedies, including a bargaining order, for "a clear abuse of discretion." *United Steel Workers of Am. AFL-CIO-CLC v. NLRB*, 482 F.3d 1112, 1116 (9th Cir. 2007). "The Board's discretion in the selection of appropriate remedies is exceedingly broad." *Id.* "The Board clearly abuses its discretion if its order is a patent attempt to achieve ends other than those that can be fairly said to effectuate the policies of the [National Labor Relations] Act." *Id.* (quotation marks omitted).

### A. Setting Aside the Results of the Election

Cemex's challenge to the Board's decision to set aside the results of the

election is based solely on its challenges to the Board's underlying ULP findings. Because we have rejected those challenges, Cemex has not shown that the Board clearly abused its discretion in setting aside the results of the election.

## B. *Gissel* Bargaining Order

Under *Gissel*, the Board may issue a remedial bargaining order if the union had majority status at some point, and the Board finds that "the possibility of erasing the effects" of the employer's unfair labor practices and of ensuring a fair election "by the use of traditional remedies, though present, is slight[,]" and that "employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." *Gissel*, 395 U.S. at 614-15.

"[T]he determination of whether a bargaining order is warranted is a task, not for the reviewing courts, but for the Board based on its expert estimate as to the effects on the election of the unfair labor practices." *NLRB v. Bighorn Beverage*, 614 F.2d 1238, 1243 (9th Cir. 1980) (citing *Gissel*, 395 U.S. at 612 n.32). Still, because a bargaining order is an unusual remedy, we require the Board to "clearly articulate why a bargaining order is warranted and why other remedies are insufficient." *United Steel Workers of Am.*, 482 F.3d at 1117.

The Board found, and Cemex does not dispute, that the Union had a majority status by the end of November 2018. *Cemex*, 327 NLRB No. 130, at 13 & n.27. Cemex contends that the Board failed to adequately explain its reasons for

concluding that a bargaining order is warranted and why other remedies are insufficient. We disagree, as the Board provided extensive reasoning that is more than sufficient. *Id.* at 12-19; *compare NLRB v. Davis*, 642 F.2d 350, 354-55 (9th Cir. 1981) (enforcing *Gissel* bargaining order and finding ALJ's paragraph of explanatory reasoning, adopted by the Board, was sufficient), *with Gardner Mech. Servs., Inc. v. NLRB*, 115 F.3d 636, 643 (9th Cir. 1997) (denying enforcement because the Board "made no findings whatsoever as to the necessity of a bargaining order, or the propriety of any other, less drastic remedies").

We turn to Cemex's argument that the violations were not serious and pervasive enough to justify a bargaining order. The Board explained that a bargaining order was warranted because Cemex had engaged in "pervasive coercive misconduct [], including its unlawful discharge of Ornelas, multiple threats of job loss and plant closure, and numerous other unfair labor practices," that "were at least as severe as those found warranting a bargaining order in the consolidated cases before the Court in *Gissel*." *Cemex*, 327 NLRB No. 130, at 13.

The Board further explained that Cemex engaged in at least three categories of conduct (threats of plant closure, threats of job loss, and discipline and discharge of a prominent union supporter) that the Board and courts have recognized as "hallmark" violations which "tend to have such a coercive and long-lasting impact on employees' free choice in a potential rerun election that, absent 'some

significant mitigating circumstance,' they generally warrant a bargaining order 'without extensive explication.'" *Id.* at 14 (first quoting *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212-213 (2d Cir. 1980), then quoting *NLRB v. Gen. Wood Preserving Co.*, 905 F.2d 803, 822-824 (4th Cir. 1990)); *see also Stevens Creek Chrysler Jeep Dodge, Inc.*, 357 NLRB 633, 638 (2011), *enforced sub nom.*, *Mathew Enter., Inc. v. NLRB*, 498 F. App'x 45 (D.C. Cir. Dec. 14, 2012) ("Threats of job loss and plant closure are 'hallmark' violations, long considered by the Board to warrant a remedial bargaining order because their coercive effect tends to 'destroy election conditions, and to persist for longer periods of time than other unfair labor practices.'" (quoting *Evergreen Am. Corp.*, 348 NLRB 178, 180 (2006))); *id.* (concluding that discharge of a prominent union supporter "is a 'hallmark' violation, perhaps the most flagrant, 'because no event can have more crippling consequences to the exercise of Section 7 rights than the loss of work'" (quoting *Mid-East Consolidation Warehouse*, 247 NLRB 552, 560 (1980))); *NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 666 (9th Cir. 2001), *abrogated on other grounds*, *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010) (recognizing unlawful discharges and threats of plant closure as "hallmark" violations justifying a bargaining order).

The Board also found that most of Cemex's coercive and unlawful misconduct "stemmed not from the mistakes of a few managers who failed to

understand the rules, but rather from a carefully crafted corporate strategy," and that "[t]he purposefulness of [Cemex's] unlawful conduct here strongly suggests that it would likely meet a rerun election with a similarly aggressive union-avoidance strategy, similarly prone to stray into unlawful coercion." *Cemex*, 327 NLRB No. 130, at 13. The Board also explained that the inference it drew regarding the likelihood of future misconduct was also supported by the judge's findings that "at least three high-level [Cemex] officials intentionally fabricated testimony at the hearing in this matter to conceal [Cemex's] unlawful conduct." *Id.*[3] Considering these findings, the Board concluded that "[s]imply requiring [Cemex] to refrain from future threats and other coercive conduct, to reinstate Ornelas with backpay, and to post a notice, while remedially necessary, would not, in our view, be sufficient to dispel the coercive atmosphere [Cemex had] carefully cultivated here." *Id.* at 16.

The Board acted well within its range of discretion in issuing the bargaining order. We have enforced bargaining orders with less serious violations than those presented here. *See, e.g.*, *Hambre Hombre Enters., Inc. v. NLRB*, 581 F.2d 204, 206-07 (9th Cir. 1978) (enforcing bargaining order based on unlawful termination

---

[3] "[I]t is well settled that the judge and the Board are entitled to draw such reasonable inferences. Moreover, *Gissel* teaches that, '. . . a reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship.'" *Davis*, 642 F.2d at 354-55 (quoting *Gissel*, 395 U.S. at 620).

of one employee and one instance of surveillance); *NLRB v. Pac. Sw. Airlines*, 550 F.2d 1148, 1150, 1152 (9th Cir. 1977) (enforcing bargaining order where employer committed unlawful interrogation, recission of wage increase, made threats of job loss, and unlawfully fired one employee); *NLRB v. L.B. Foster Co.*, 418 F.2d 1, 2 (9th Cir. 1969) (enforcing bargaining order based on two threats of job loss, one threat of plant closure, and one unlawful interrogation). *See also Gissel,* 395 U.S. at 587-89, 618-20 (upholding bargaining order where unfair labor practices involved only threats of plant closure).

Cemex argues that the Board failed to consider the extent of pervasiveness or dissemination when assessing the need for a bargaining order. That is incorrect. The Board expressly considered that factor and explained the evidentiary bases for its findings that Cemex's "misconduct was . . . even more broadly disseminated than expressly discussed by the judge" and that Cemex's "unfair labor practices clearly were disseminated to and impacted a substantial proportion of employees in the unit." *Cemex*, 327 NLRB No. 130, at 16 n.96. The Board also explained why greater dissemination was not required given the close margin of the election vote. *Id.* at 16. To the extent Cemex disputes the Board's factual findings regarding the extent of dissemination, those findings are supported by substantial evidence. *See supra*, 3-19.

Cemex also argues that the Board failed to consider changed circumstances

as mitigating the need for a bargaining order. Again, that is incorrect. The Board expressly considered whether any "significant mitigating circumstance" negated the need for a bargaining order, including changed circumstances. *Cemex*, 327 NLRB No. 130, at 16-19. Moreover, Cemex's reliance on changes that occurred during "intervals of adjudication" is misplaced, because those changes are "irrelevant" to our assessment of the Board's order. *E. Bay Auto. Council v. NLRB*, 483 F.3d 628, 635 (9th Cir. 2007). We assess the propriety of a bargaining order as of the dates that the unfair labor practice conduct occurred. *See NLRB v. Bakers of Paris, Inc.*, 929 F.2d 1427, 1448 (9th Cir. 1991).

Cemex cites two cases in which we considered personnel turnover to be a relevant factor when denying enforcement of a bargaining order, *NLRB v. Peninsula Association for Retarded Children & Adults*, 627 F.2d 202, 205 (9th Cir. 1980) and *NLRB v. Western Drug*, 600 F.2d 1324, 1327 (9th Cir. 1979). Both cases are inapposite. In *Peninsula*, both the manager responsible for the violations and most of the employees left *before* the election even occurred—not during an interval of adjudication. 627 F.2d at 205. In *Western Drug*, we expressly "limit[ed] our holding to the facts presented[,]" including the facts that "[a]ll the employees in the unit voluntarily terminated their employment for reasons unrelated to the unfair practices" "before the unfair practice charges were tried, and there was no

unusual delay in trying the charges." 600 F.2d at 1326-27.[4]

For all these reasons, the Board did not clearly abuse its discretion in issuing a *Gissel* bargaining order.[5]

### C. *Thryv* Remedies

Cemex challenges the validity of *Thryv* remedies under the NLRA and the Seventh Amendment. Cemex's arguments are foreclosed by our holdings in

---

[4] The dissent contends that the Board erred when it stated, "We accordingly agree with the judge that the whole record of this case clearly supports concluding that the possibility of erasing the effects of [Cemex's] highly coercive misconduct and ensuring a fair rerun election by the use of the Board's traditional remedies is slight." *Cemex*, 372 NLRB No. 130, at 15-16; *see also* Dissent at 5-7. Read in context, the Board was referring to its agreement with the ALJ's conclusions that "the unlawful discharge of Ornelas, the threats of job loss and plant closure, along with the other unfair labor practices committed by Cemex, are certainly severe enough to warrant a bargaining order," and that the passage of time, employee turnover, and management turnover were not mitigating factors. *Cemex*, 327 NLRB No. 130, at 113. The ALJ ultimately declined to issue a *Gissel* bargaining order only because it found that the extent of dissemination was a mitigating factor. *Id.* at 115. The Board more than adequately explained why it disagreed with the ALJ's findings regarding the extent of dissemination and consequently concluded that there were no mitigating factors. *Id.* at 11-12, 16. While the Board's wording may have been inartful in this instance, that is not a proper basis for denying enforcement of its *Gissel* order.

[5] Because we affirm the bargaining order under *Gissel*, we do not reach the parties' dispute over the retroactive application of the new standard for a bargaining order adopted by the Board in its Decision. The dissent agrees that we do not need to address the merits of this challenge, but it expresses its opinion on the merits anyway. *See* Dissent at 7-10. Rather than follow the dissent down that path, we note only that we chose not to address the merits of this challenge because the NLRB and Union filed a motion to resume proceedings (Dkt. Nos. 106, 110), and reaching the merits would unnecessarily delay this case's resolution. In accord with this approach, we express no view on this issue we need not reach.

*Macy's*, 155 F.4th at 1046, 1048-49 (*Thryv* remedies do not violate NLRA) and

*North Mountain Foothills Apartments*, 157 F.4th at 1099-1100 (*Thryv* remedies do

not violate the Seventh Amendment).

### 4. Union's Cross-Petition for Review

#### A. ULP Findings Challenged by Union

In its cross-petition for review, the Union argues the Board erred by failing

to find four additional ULPs.

The Union's first two challenges concern allegations that Cemex unlawfully

promised employees benefits if they voted against unionization. Regarding the first

challenge, the ALJ dismissed the allegation that Area Manager Turner told a driver

that drivers would receive new trucks and raises only if they rejected the Union,

and the Board found "it unnecessary to pass on whether the General Counsel

presented sufficient evidence to establish this violation because finding the

violation would not materially affect the remedy." *Cemex*, 327 NLRB No. 130, at 8

n.46. Regarding the second challenge, the ALJ *sua sponte* noted that some

statements in Cemex videos appeared to be unlawful promises of benefits, and the

General Counsel asked the Board to find additional violations. *Id.* at 10 n.49. The

Board again declined because additional findings would not materially affect the

remedy. *Id.*

The Board's decision not to find a ULP is "'accorded considerable deference

as long as it is rational and consistent with the statute.'" *Int'l Bhd. of Elec. Workers, Loc. 21 v. NLRB*, 563 F.3d 418, 422 (9th Cir. 2009) (quoting *Loc. Joint Exec. Bd. of Las Vegas v. NLRB*, 515 F.3d 942, 945 (9th Cir. 2008)). The Union contends that additional findings could be relevant if any of Cemex's challenges to the other unfair labor practice findings were successful, or could affect review of the Board's *Gissel* bargaining order. Because we have rejected Cemex's challenges to the Board's ULP findings and remedies, we agree with the Board that additional ULP findings are unnecessary, and we defer to the Board's decision not to reach these issues.

Third, the Union argues that the Board erred in refusing to overrule *Babcock & Wilcox*, 77 NLRB 577 (1948), which generally permits employers to require employees to attend "captive audience meetings" before an election. The Board properly declined to overrule *Babcock* because the issue was not fully litigated: the General Counsel did not allege such a violation in the complaint. *Cemex*, 327 NLRB No. 130, at 3 n.15; *Pergament*, 296 NLRB at 334.

Fourth, the Union argues that the Board erred in declining to find that Vice President Forgey's threats of loss of ability to go to management violated § 8(a)(1). The ALJ found that Forgey's statements violated § 8(a)(1), but the Board reversed because the ALJ relied on cases later abrogated by *Tri-Cast, Inc.*, 274 NLRB 377 (1985). *Cemex*, 327 NLRB No. 130, at 6-7. The Board declined to overrule *Tri-*

*Cast*. *Id.* at 7 n.38. The Board generally does not err when it "correctly applie[s] its own law," *NLRB v. Siren Retail Corp.*, 99 F.4th 1118, 1127 (9th Cir. 2024), and the NLRA grants the Board significant discretion in determining whether conduct violates the NLRA. *See, e.g.*, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998); *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978). Accordingly, the Board did not abuse its discretion in declining to reconsider *Tri-Cast*, and we decline to do so in the first instance.

### B. Union's Request for Additional Remedies

The Union argues that the Board erred in not adopting two provisions of the ALJ's recommended remedies, which would give the Union access to Cemex's facilities for two years. The Board, however, explained that the access remedies were designed to ensure a fair rerun election and were unnecessary in light of the bargaining order. *Cemex*, 327 NLRB No. 130, at 2 n.6, 38. The Board did not clearly abuse its discretion.

**Cemex's petition is DENIED. The Board's cross-petition and application for enforcement is GRANTED. The Union's petition is DENIED.**

No. 23-2081, *International Brotherhood of Teamsters v. NLRB*
No. 23-2302, *Cemex Construction Materials Pacific, LLC v. NLRB*
No. 23-2377, *NLRB v. Cemex Construction Materials Pacific, LLC*

FILED

APR 21 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

CLIFTON, Circuit Judge, dissenting:

This case presents the question of whether the National Labor Relations Board ("NLRB" or "Board") properly ordered an employer to recognize and bargain with a union even though a majority of the employees in the proposed bargaining unit voted in a secret ballot election against recognizing the union as their agent. Put in the spotlight by the Board's treatment of this case is the decision by the Supreme Court more than 50 years ago in *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969), in which the Court approved the issuance of such an order by the Board in defined circumstances. In our case, the Board declared (in a split decision, over a dissent of one member) that those circumstances existed and issued a bargaining order, but in doing so purported to rely upon a faulty premise – a finding by the administrative law judge ("ALJ") assigned to the case that he did not in fact make.

Doubling down, the Board (again over a dissent) then went on to change the standard that it had for decades applied – the standard approved by the Court in *Gissel* – then applied the new standard to the facts of this case retroactively in order to reach through a different route the same result that it had already reached. The majority disposition concludes that we do not need to examine the change in

1

standard, though vigorously challenged in our case, because it is not necessary to affirm the Board's issuance of the bargaining order. That is true, so I will not take up that challenge separately. Still, the process employed by the Board casts a shadow on its treatment of the decision that we do have to review, issuance by the Board of the bargaining order based on the particular facts of our case. It confirms for me the questionable nature of the Board's decision in our case.

I respectfully dissent regarding the remedy imposed by the Board. I would grant the employer's petition for review, vacate that part of the order, and remand for further consideration.[1]

## 1.    Background

The employer in this case is Cemex Construction Materials Pacific, LLC ("Cemex"). It is a subsidiary of a multinational building materials company that provides ready-mix concrete, cement, and aggregates to construction-industry customers including in Southern California and Las Vegas, Nevada. (The

---

[1]    I agree with my colleagues and the majority disposition that substantial evidence supported the finding that the employer committed numerous unfair labor practices. I might not agree as to all the details of the alleged allegedly unfair practices, but there was ample evidence to support the broad findings. I also agree that the Board did not abuse its discretion in setting aside the results of the election. The margin was narrow and the conclusion that the unfair practices might have impacted the election enough to make a difference was warranted.

Regarding the Union's Cross-Petition for Review, I agree with the majority disposition's rejection of the additional unfair practices asserted in that petition and its request for additional remedies.

background facts reported here are drawn from the Board's decision and order in this case. *Cemex Constr. Materials Pac., LLC and Int'l Bhd. of Teamsters*, 372 NLRB No. 130, at 1–2 (Aug. 25, 2023) ("*Cemex*")).

The bargaining unit consisted of about 366 ready-mix drivers and driver trainers employed by Cemex at approximately 24 facilities. The International Brotherhood of Teamsters ("Union") gathered authorization cards signed by at least 207 drivers (approximately 57 percent of the unit) during October and November 2018. The Union filed a petition for a Board-supervised election.

In that election, held on March 7, 2019, the employees voted against representation by the Union, 179 to 166, a margin of 13 votes. The NLRB General Counsel and the Union alleged that Cemex engaged in extensive unlawful and otherwise coercive conduct before, during, and after the election, which required, among other remedial measures, setting aside the results of the election and affirmatively ordering Cemex to bargain with the Union under *Gissel*. The Board ultimately issued such an order. That is the order now before us via petitions for review.

## 2. *Gissel Packing*

In *Gissel*, the Court approved the Board's issuance of a bargaining order in certain circumstances. It noted that recognition of a union by a secret ballot election was the best way to protect the rights of employees to decide the question

3

of representation: "The Board itself has recognized, and continues to do so here, that secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support." *Gissel*, 395 U.S. at 602. But when the union has previously demonstrated majority support and the employer's unfair practices have impeded a fair election, a bargaining order might be appropriate. The key requirement for purposes of our case is that "the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight." *Gissel*, 395 U.S. at 614. Note the word "slight." The Board's decision, at 12, included that word by quoting *Gissel* when laying out the requirements of the Court's decision. *Cemex*, 372 NLRB No. 130, at 12.

3.     **The Board's Order under *Gissel***

As noted above and as described by the majority disposition, at 21–28, the Board issued an order requiring Cemex to recognize and bargain with the Union, described in both the Board Order and by the majority disposition as a "*Gissel* Bargaining Order." That required, as just noted, a determination that "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight." *Gissel*, 395 U.S. at 614.

4

The Board's decision sought to support the required finding by expressing agreement with the ALJ's finding to that effect: "We accordingly agree with the judge that the whole record of this case clearly supports concluding that the possibility of erasing the effects of the [Cemex's] highly coercive misconduct and ensuring a fair rerun election by the use of the Board's traditional remedies is slight." *Cemex*, 372 NLRB No. 130, at 15–16. The word "slight" was not chosen by accident; it deliberately repeated the word used and requirement established in *Gissel*.

But the ALJ made no such finding. His decision used the word "slight" in stating the *Gissel* standard, quoting the same language from the Court's decision as I did above and the Board did early in its order. The ALJ did not use that term or anything like it to state a determination that the possibility of ensuring a fair election was slight.

To the contrary, the ALJ expressly stated that he "decline[d] to recommend that a *Gissel* bargaining order issue." *Id.* at 115 (the ALJ decision is attached to and follows the Board's decision in the NLRB volume). To the contrary, though the ALJ found that "Cemex committed extraordinary violations," he ultimately concluded that "the fact the unfair labor practices did not affect a substantial percentage of the overall Unit weighs against the imposition of a bargaining order." *Id.* Instead, he recommended that "additional remedial action be ordered to

5

'dissipate as much as possible the lingering atmosphere of fear created by Respondent's unlawful conduct and to insure' employees will be able to voice a free choice' when a re-run election occurs." *Id.* (quoting *Haddon House Food Products, Inc.,* 242 NLRB 1057, 1058–1059 (1979), *enfd. in pert. part*, 640 F.2d 392 (D.C. Cir. 1981), *cert. denied*, 454 U.S. 827 (1981)).

The Board is not required to accept the determinations of the ALJ. When the Board departs from the ALJ's findings, though, we subject the Board's finding to a "more searching form of review." *Delta Sandblasting Co., Inc. v. NLRB*, 969 F.3d 957, 965 (9th Cir. 2020). The majority disposition acknowledges as much, at 8. The majority disposition applies that searching review as to particular points as to which the Board and ALJ differed, notably as to the interpretation of certain statements made by Cemex Vice President Forgey. *See* Majority Disposition at 6–9.

The Board did acknowledge and discuss some disagreement with the ALJ, especially as to scope of dissemination to other employees of Cemex's misconduct and as to the likelihood that a renewed organizing drive and new election would be met with new misconduct. *Cemex*, 372 NLRB No. 130, at 16. But it never explained how it could rest its broad conclusion that the *Gissel* requirement that the possibility of a fair rerun election was "slight" on agreement with a finding that the ALJ did not make.

A conclusion based on such a false premise cannot be sustained. It is a basic tenet of our review of a decision by the NLRB or by an agency generally that we have to base that review on what the agency actually said. *Louisiana-Pac. Corp., W. Div. v. NLRB*, 52 F.3d 255, 259 (9th Cir. 1995) ("A reviewing court 'must judge the propriety of [agency] action solely by the grounds invoked by the agency,' and 'that basis must be set forth with such clarity as to be understandable.'") (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947)). What the agency purported to rely upon by expressing agreement with the ALJ's finding cannot properly stand where the ALJ made no such finding.

## 4.      The Board's Decision Changing the Standard

As stated in my introduction above, the Board in its decision in this case did not stop with its issuance of a bargaining order under *Gissel*. It issued what it variously described as a "new standard" or "new framework," *Cemex*, 372 NLRB No. 130, at 25, to replace the approach approved by the Court in *Gissel*. Most importantly for our purposes, the Board announced that "if the employer commits an unfair labor practice that requires setting aside the election, the petition (whether filed by the employer or the union) will be dismissed, and the employer will be subject to a remedial bargaining order." *Id.* at 26.

What that deletes from the requirements recognized by the Board and by the Supreme Court in *Gissel* is the piece discussed above regarding our case, that the

7

possibility of a fair election was "slight." The finding of a single unfair labor practice will be enough to support a bargaining order under this new standard even if the violation would not be expected to impact the fairness of a new election. The Board went on to apply that new standard retroactively to the facts of this case, concluding that it provided a separate and additional basis upon which to support the bargaining order it issued. The Board thus cast aside what had been recognized by the Board and by the Court for more than five decades, that "secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support." *Gissel*, 395 U.S. at 602.

The Board's decision explicitly noted, at 30, that Cemex was not prejudiced by the retroactive application of this new standard because the Board had already reached the same result under the old standard. Of course, that also meant that the creation of a new standard in this case was entirely unnecessary to resolve this case. That is one of the reasons cited by the Sixth Circuit recently in setting aside that part of the Cemex Board's decision when the Board sought to apply the new standard in a different case involving different parties. *See Brown-Forman Corp. v. NLRB*, 169 F.4th 646, 657 (6th Cir. 2026).

The majority disposition accurately concludes, at 28 n. 5, that we do not need to reach the arguments over the new standard or its retroactive application in this case. As a result, I will not delve into those arguments beyond noting that I

8

think the Sixth Circuit majority's reasoning is more persuasive than that offered in the dissent in that case or by the NLRB General Counsel in its submission to us, under Rule 28(j) of the Federal Rules of Appellate Procedure, stating its disagreement with that decision.

What does matter for current purposes is that the Board was prepared to change the rules and applied the new standard to the facts of this case retroactively in order to reach the same result that it had already reached. What that says to me is that the Board understood that it was on thin ice with its conclusion that under *Gissel* a bargaining order was appropriate and should be issued. Changing the rules in the middle of a game implied recognition that the goal could not properly be reached otherwise.

That is especially true here. In announcing the new standard, the Board noted that one of the reasons was that "[r]eviewing courts have sometimes disagreed with the Board's assessment of the likely continuing effects of an employer's unfair labor practices, particularly where the fair adjudication of unfair labor practice allegations has resulted in substantial delays." *Cemex*, 372 NLRB No. 130, at 27. It turns out that courts of appeals, including ours, have not always been persuaded by the reasoning offered by the Board. The Board's response was to change the standard so that the possibility of a fair rerun election is no longer an issue and courts are not able to disagree with the Board on that subject. That may

9

reflect candor, but it is not an endorsement of how the Board has approached this case. In my eyes, it casts a substantial shadow on everything the Board did with this case, in particular its willingness to rest the finding required by *Gissel* that the possibility of a fair rerun election is "slight" on a purported finding by the ALJ that the ALJ did not in fact make.

I thus respectfully dissent. I would grant the employer's petition, vacate the Board's decision and remand for further consideration.